# 16-4230-cv(L)

## 16-4233-cv(CON); 16-4235-cv(CON); 16-4243-cv(CON); 16-4305-cv(CON); 16-4308-cv(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

◆◆◆

EASTMAN KODAK COMPANY, AGFA CORPORATION, AGFA GRAPHICS NV, FUJIFILM MANUFACTURING U.S.A., INC., MAG INSTRUMENT INCORPORATED, CLARIDGE PRODUCTS AND EQUIPMENT, INCORPORATED, individually and on

(*Caption continued on inside cover*)

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
THE HONORABLE KATHERINE B. FORREST

## JOINT BRIEF OF DEFENDANTS-APPELLEES

Richard C. Pepperman II
Suhana S. Han
William H. Wagener
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone: (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Defendants-Appellees*
*The Goldman Sachs Group, Inc.,*
*Goldman Sachs & Co. LLC,*
*Goldman Sachs International,*
*J. Aron & Company LLC, MITSI*
*Holdings LLC and Metro*
*International Trade Services L.L.C.*

John M. Nannes
John H. Lyons
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 371-7500
Facsimile:  (202) 661-9191

*Attorneys for Defendant-Appellee*
*Pacorini Metals USA, LLC (now known*
*as Access World (USA) LLC)*

(*Counsel continued on inside cover*)

July 12, 2017

behalf of all others similarly situated, CUSTOM ALUMINUM PRODUCTS INCOROPRATED, AMPAL INCORPORATED, EXTRUDED ALUMINUM CORPORATION, REYNOLDS CONSUMER PRODUCTS LLC, SOUTHWIRE COMPANY, LLC,

*Plaintiffs-Appellants,*

—against—

HENRY BATH LLC, METRO INTERNATIONAL TRADE SERVICES, L.L.C., JP MORGAN CHASE & CO., GOLDMAN SACHS & CO. LLC, GOLDMAN SACHS INTERNATIONAL, JPMORGAN SECURITIES PLC, GLENCORE LTD., PACORINI METALS USA, LLC, PACORINI METALS VLISSINGEN B.V., JPMORGAN CHASE BANK, N.A., GLENCORE INTERNATIONAL AG, GLENCORE AG, J. ARON & COMPANY LLC, MITSI HOLDINGS LLC, ACCESS WORLD (USA) LLC, HENRY BATH & SON LIMITED,

*Defendants-Appellees,*

GLENCORE XSTRATA PLC, GS POWER HOLDINGS LLC, MCEPF METRO I, INCORPORATED, GOLDMAN SACHS GROUP, INC., PACORINI METALS AG, LONDON METAL EXCHANGE LIMITED, LONDON METAL EXCHANGE LIMITED, JOHN DOES 1-10, DOES 1-10, inclusive, UNIDENTIFIED PARTIES, JOHN DOES 1-50,

*Defendants.*

———————————————

Robert D. Wick
Henry Liu
John Playforth
COVINGTON & BURLING LLP
One City Center
850 10th Street NW
Washington, D.C. 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
*Attorneys for Defendants-Appellees*
*Henry Bath LLC, Henry Bath & Son,*
*Ltd., JPMorgan Chase & Co.,*
*JPMorgan Chase Bank, N.A. and*
*J.P. Morgan Securities plc*

Eliot Lauer
Jacques Semmelman
CURTIS, MALLET-PREVOST, COLT
& MOSLE LLP
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
Facsimile: (212) 697-1559
*Attorneys for Defendant-Appellee*
*Glencore Ltd.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the undersigned counsel for Defendants-Appellees state as follows.

The undersigned counsel for The Goldman Sachs Group, Inc. ("GS Group"), Goldman Sachs & Co. LLC ("Goldman Sachs"), Goldman Sachs International ("GSI") and J. Aron & Company LLC ("J. Aron") (collectively, "Goldman") and MITSI Holdings LLC and Metro International Trade Services LLC (collectively, "Metro") certifies the following: GS Group is a corporation organized under the laws of Delaware, and its shares are publicly traded on the New York Stock Exchange. GS Group has no parent corporation, and to the best of GS Group's knowledge, no publicly held company owns 10% or more of GS Group's common stock. GSI and J. Aron are direct wholly-owned subsidiaries of GS Group. Goldman Sachs is a direct wholly-owned subsidiary of GS Group, except for de minimis non-voting, non-participating interests held by unaffiliated broker-dealers. Metro is wholly owned by Reuben Brothers SA, and to the best of Metro's knowledge, no publicly held company owns 10% or more of Reuben Brothers SA.

The undersigned counsel for JPMorgan Chase & Co. certifies that it does not have any parent corporations and that no publicly held corporation owns 10% or more of its stock. The undersigned counsel for JPMorgan Chase Bank, N.A. and J.P. Morgan Securities plc certifies that their ultimate parent corporation is

JPMorgan Chase & Co. JPMorgan Chase & Co. indirectly owns 10% or more of the stock of JPMorgan Chase Bank, N.A. and J.P. Morgan Securities plc, and no other publicly held corporation owns 10% or more of the stock of JPMorgan Chase Bank, N.A. or J.P. Morgan Securities plc. The undersigned counsel for Henry Bath LLC and Henry Bath & Son Ltd. certifies that their ultimate parent company is CMST Development Co. and that no publicly held corporation owns 10% or more of the stock of Henry Bath LLC or Henry Bath & Son Ltd. Henry Bath & Son Ltd. is domiciled in the United Kingdom. By filing this disclosure statement, Henry Bath & Son Ltd. does not agree to submit to the jurisdiction of U.S. courts and does not waive any defense, including, but not limited to, lack of personal jurisdiction.

The undersigned counsel for Pacorini Metals USA, LLC (now known as Access World (USA) LLC) certifies that the following are corporate parents, affiliates and/or subsidiaries of said party that are publicly held: Glencore plc (f/k/a Glencore Xstrata plc).

The undersigned counsel for Glencore Ltd. ("Glencore") certifies that the following are corporate parents, affiliates, and/or subsidiaries of said party that are publicly held: Glencore plc (f/k/a Glencore Xstrata plc).

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................1

STATEMENT OF THE ISSUES PRESENTED .....................................3

STATEMENT OF THE CASE...........................................................4

    A.    Statement of Facts ...........................................................4

        1.    The Aluminum Market ............................................5

        2.    The LME Warehouse Market .....................................5

        3.    Delivery Queues at LME Warehouses.........................7

            a.    The Global Aluminum Surplus .........................8

            b.    The Detroit Queue ...........................................9

    B.    Plaintiffs' Claims...........................................................10

        1.    The Parties...........................................................11

        2.    The Alleged Conspiracy .........................................12

        3.    Plaintiffs' Alleged Injury ......................................14

            a.    Aluminum Pricing .........................................14

            b.    The Effect of Queues on Aluminum Prices....................16

    C.    Procedural History..........................................................17

        1.    *Aluminum I*:  The District Court Dismisses the Commercials and Consumers' Claims.....................................18

        2.    *Aluminum II*:  The District Court Concludes That the FLPs and IPs Adequately Allege Antitrust Injury ...................18

        3.    *Aluminum III*:  This Court Holds That the Commercials and Consumers Did Not Suffer Antitrust Injury......................20

4. *Aluminum IV*: The District Court Dismisses the FLPs' Claims Under *Aluminum III* .......................................................23

5. *Aluminum V*: The District Court Dismisses the Remaining Plaintiffs' Claims Under *Aluminum III* .................25

    a. The IPs .................................................................26

    b. Reynolds and Southwire .................................28

SUMMARY OF ARGUMENT .............................................................29

ARGUMENT ........................................................................................35

I. The Dismissal of the FLPs' Action Should Be Affirmed ...........................35

A. *Aluminum III* Controls and Requires Dismissal of the FLPs' Action .......................................................................36

B. The FLPs Cannot Establish Antitrust Injury Under an "Inextricably Intertwined" Theory .......................................44

C. The FLPs Cannot Establish "Traditional" Antitrust Injury ...............45

1. *Aluminum III* Forecloses the FLPs' Claim of "Traditional" Antitrust Injury .................................................45

2. The FLPs' "Traditional" Theory of Antitrust Injury Is Untimely.........................................................................48

    a. The FLPs Allege Separate Markets for Warehouse Services and Aluminum.................................49

    b. The FLPs Allege Conduct That Directly Restrained the Warehouse Market, Not the Aluminum Market .........................................51

3. The FLPs' Theory of "Traditional" Antitrust Injury Fails for Additional Reasons ............................................55

    a. The FLPs Did Not Suffer Antitrust Injury as Defendants' "Competitors" .............................56

      b.     The FLPs Did Not Suffer Antitrust Injury as Defendants' "Consumers" ................................................59

    4.     The District Court Did Not Disregard the "Factual Record" Submitted by the FLPs .................................63

  D.    The District Court Properly Denied the FLPs' Post-Judgment Request for Leave to Amend ...............................................64

II.    The Dismissal of the IPs' Actions Should Be Affirmed ...............67

  A.    The IPs Have Not Alleged Horizontal Price Fixing ...........68

  B.    The IPs Did Not Suffer Antitrust Injury Under *Aluminum III* ............71

  C.    The IPs' Attempts to Distinguish *Aluminum III* Do Not Withstand Scrutiny ..................................................73

  D.    The Three Parent or Affiliated Companies Were Properly Dismissed ...........................................................77

  E.    The Denial of Leave to Amend Was Not an Abuse of Discretion ..........................................................81

    1.     Rule 16(b)'s Good Cause Standard Applies .............................82

    2.     The District Court Did Not Abuse Its Discretion ....................84

    3.     Even If Rule 15(a) Applies, There Was No Abuse of Discretion .......................................................88

III.    The Dismissal of Reynolds and Southwire's Action Should Be Affirmed ...........................................................88

  A.    Reynolds and Southwire Cannot Allege Antitrust Injury Under *Aluminum III* ..................................................89

  B.    Reynolds and Southwire's State-Law Claims Fail ...........96

  C.    The District Court Properly Rejected Reynolds and Southwire's Proposed Amended Complaint ..............................................96

CONCLUSION ......................................................97

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*In re Actos End Payor Antitrust Litig.*,
  2015 WL 5610752 (S.D.N.Y. Sept. 22, 2015), *vacated in part on
  other grounds*, 848 F.3d 89 (2d Cir. 2017) .......................................................96

*In re Aluminum Warehousing Antitrust Litig.*,
  833 F.3d 151 (2d Cir. 2016) ...................................................................*passim*

*Am. Ad Mgmt., Inc.* v. *Gen. Tel. Co. of Cal.*,
  190 F.3d 1051 (9th Cir. 1999) ...................................................................37, 38

*Am. Needle, Inc.* v. *Nat'l Football League*,
  560 U.S. 183 (2010) ............................................................................................58

*Atl. Richfield Co.* v. *USA Petroleum Co.*,
  495 U.S. 328 (1990) ............................................................................................58

*Blue Shield of Va.* v. *McCready*,
  457 U.S. 465 (1982) ....................................................................................19, 76

*Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ............................................................................................57

*Cargill, Inc.* v. *Monfort of Colo., Inc.*,
  479 U.S. 104 (1986) ............................................................................................58

*Cohen* v. *Stevanovich*,
  722 F. Supp. 2d 416 (S.D.N.Y. 2010) ...............................................................79

*Copperweld Corp.* v. *Independence Tube Corp.*,
  467 U.S. 752 (1984) ............................................................................................58

*Crimpers Promotions Inc.* v. *Home Box Office, Inc.*,
  724 F.2d 290 (2d Cir. 1983) ..............................................................................77

*Daniel* v. *Am. Bd. of Emergency Med.*,
  428 F.3d 408 (2d Cir. 2005) ..............................................................................73

-vi-

*Donovan* v. *Centerpulse Spine Tech Inc.*,
  416 F. App'x 104 (2d Cir. 2011) ...............................................54, 55

*Dziedzic* v. *State Univ. of N.Y. at Oswego*,
  648 F. App'x 125 (2d Cir. 2016) ...................................................54

In re *Enron Corp. Sec. Litig.*,
  610 F. Supp. 2d 600 (S.D. Tex. 2009) ............................................55

*Enzo Biochem, Inc.* v. *Amersham PLC*,
  981 F. Supp. 2d 217 (S.D.N.Y. 2013) ............................................55

*FTC* v. *Superior Court Trial Lawyers Ass'n*,
  493 U.S. 411 (1990) .................................................................70, 71

*Gatt Commc'ns, Inc.* v. *PMC Assocs., LLC*,
  711 F.3d 68 (2d Cir. 2013) .........................................................37, 50

*Gelboim* v. *Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016) .......................................................62, 71

In re *Gen. Elec. Co. Sec. Litig.*,
  2012 WL 2892376 (S.D.N.Y. July 12, 2012) ...................................84

*Gosain* v. *State Bank of India*,
  414 F. App'x 311 (2d Cir. 2011) ...................................................97

*Greater Rockford Energy & Tech. Corp.* v. *Shell Oil Co.*,
  998 F.2d 391 (7th Cir. 1993) .......................................................36

*Green* v. *Mattingly*,
  585 F.3d 97 (2d Cir. 2009) ..........................................................64

*Grochowski* v. *Phoenix Constr.*,
  318 F.3d 80 (2d Cir. 2003) .........................................................82, 84

*Hollander* v. *Members of Bd. of Regents of Univ. of N.Y.*,
  524 F. App'x 727 (2d Cir. 2013) ...................................................65

*Hughes* v. *Tobacco Inst., Inc.*,
  278 F.3d 417 (5th Cir. 2001) .......................................................37

*Ill. Brick Co.* v. *Illinois*,
   431 U.S. 720 (1977) ........................................................................42

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010) ............................................................78

*James* v. *Watt*,
   716 F.2d 71 (1st Cir. 1983) .............................................................66

*Jones* v. *Coughlin*,
   45 F.3d 677 (2d Cir. 1995) .............................................................44

*Kassner* v. *2nd Ave. Delicatessen, Inc.*,
   496 F.3d 229 (2d Cir. 2007) ............................................................84

*Knevelbaard Dairies* v. *Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000) ..........................................................95

*Laborers Local 17 Health & Benefit Fund* v. *Philip Morris, Inc.*,
   191 F.3d 229 (2d Cir. 1999) ............................................................76

*Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*,
   551 U.S. 877 (2007) ........................................................................70

*In re Lithium Ion Batteries Antitrust Litig.*,
   2014 WL 309192 (N.D. Cal. Jan. 21, 2014) ...................................79

*Loeb Indus., Inc.* v. *Sumitomo Corp.*,
   306 F.3d 469 (7th Cir. 2001) ..........................................................50

*Lotes Co.* v. *Hon Hai Precision Indus. Co.*,
   753 F.3d 395 (2d Cir. 2014) ............................................................42

*McCarthy* v. *Dun & Bradstreet Corp.*,
   482 F.3d 184 (2d Cir. 2007) ............................................................88

*McCullough* v. *Zimmer, Inc.*,
   382 F. App'x 225 (3d Cir. 2010) ................................................37, 38

*In re Napster, Inc. Copyright Litig.*,
   354 F. Supp. 2d 1113 (N.D. Cal. 2005) ..........................................42

*Nypl* v. *JPMorgan Chase & Co.*,
2017 WL 1133446 (S.D.N.Y. Mar. 24, 2017) ...................................................41

*Parker* v. *Columbia Pictures Indus.*,
204 F.3d 326 (2d Cir. 2000) ........................................................................82, 84

*Port Dock & Stone Corp.* v. *Oldcastle Ne., Inc.*,
507 F.3d 117 (2d Cir. 2007) .......................................................................57, 58

*Reading Indus., Inc.* v. *Kennecott Copper Corp.*,
631 F.2d 10 (2d Cir. 1980) .................................................................................36

*Serpa Corp.* v. *McWane, Inc.*,
199 F.3d 6 (1st Cir. 1999) ..................................................................................37

*SD3, LLC* v. *Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) ..............................................................79, 80, 81

*Smith* v. *Hogan*,
794 F.3d 249 (2d Cir. 2015) ..............................................................................65

*Southaven Land Co.* v. *Malone & Hyde, Inc.*,
715 F.2d 1079 (6th Cir. 1983) ..........................................................................38

*Thomas* v. *Scully*,
943 F.2d 259 (2d Cir. 1991) ..............................................................................67

*United States* v. *Am. Express Co.*,
838 F.3d 179 (2d Cir. 2016) ..............................................................................49

*United States* v. *Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015) ..............................................................................70

*United States* v. *Bestfoods*,
524 U.S. 51 (1998) ...............................................................................................78

*United States* v. *Huezo*,
546 F.3d 174 (2d Cir. 2008) ..............................................................................79

*United States* v. *Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940) .............................................................................................62

*Virgin Atl. Airways Ltd.* v. *British Airways PLC*,
    257 F.3d 256 (2d Cir. 2001) ................................................................69

*Williams* v. *Citigroup Inc.*,
    659 F.3d 208 (2d Cir. 2011) ................................................................65

*In re Wireless Tel. Servs. Antitrust Litig.*,
    2004 WL 2244502 (S.D.N.Y. Oct. 6, 2004) .......................................84

## Rules

Fed. R. Civ. P. 12 ....................................................................................25

Fed. R. Civ. P. 15 ..............................................................................*passim*

Fed. R. Civ. P. 16 .................................................................81, 82, 83, 84

Fed. R. Civ. P. 56 ....................................................................................25

Fed. R. Civ. P. 59 .......................................................................33, 64, 65

## Other Authorities

CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE
    § 2810.1 (3d ed. 2012) ...................................................................65, 66

# INTRODUCTION

This Court's decision in *In re Aluminum Warehousing Antitrust Litigation*, 833 F.3d 151 (2d Cir. 2016) ("*Aluminum III*"), controls these appeals. Under that decision, the dismissal of these actions for lack of antitrust injury should be affirmed.

Plaintiffs here are three sets of aluminum purchasers that contend that Defendants—three warehouse operators and their trading affiliates—engaged in anticompetitive conduct in the market for storing aluminum in London Metal Exchange ("LME") warehouses. Plaintiffs allege that Defendants' conduct in the warehouse market—a market in which Plaintiffs did *not* participate—had the indirect effect of raising prices in the aluminum market—a market in which Plaintiffs *did* participate. In *Aluminum III*, this Court decided two closely related appeals by other purchasers of aluminum and aluminum products that also asserted antitrust claims against Defendants based on the same alleged anticompetitive conduct. This Court affirmed the dismissal of those plaintiffs' claims "on the ground that they did not (and could not) suffer antitrust injury." 833 F.3d at 154. That decision disposes of these appeals as well.

As this Court explained, "to suffer antitrust injury, the putative plaintiff must be a participant in *the very market that is directly restrained*." *Id*. at 161 (emphasis added). The Court concluded that all of the anticompetitive conduct alleged by the

aluminum purchasers in *Aluminum III* "took place (if at all) in the *LME-warehouse storage market*, and that is where the direct, immediate impact would have been felt." *Id*. at 162 (emphasis added). The Court thus held that those plaintiffs did not suffer antitrust injury because they "do not and cannot allege that they participated in that market." *Id*. The Court rejected plaintiffs' attempt to "premise their claim to antitrust injury solely on their purchases of aluminum and aluminum products on the *physical aluminum market*, where prices were allegedly *affected* by the defendants' alleged anticompetitive behavior." *Id*. (emphasis added).

Applying this Court's holding in *Aluminum III*, the District Court responsible for the underlying multidistrict litigation correctly dismissed the claims of Plaintiffs here for lack of antitrust injury because they, too, did not participate in the LME warehouse storage market. The District Court held that Plaintiffs rely on the *same* alleged anticompetitive conduct (already held by this Court to directly restrain the warehouse market, not the aluminum market) and the *same* alleged injury (payment of inflated prices in the aluminum market) at issue in *Aluminum III*. As this Court did in *Aluminum III*, the District Court rejected Plaintiffs' attempt to conjure antitrust injury from the supposed effects of Defendants' conduct on aluminum prices. The court further rejected Plaintiffs' effort to manufacture antitrust injury by walking away from their longstanding allegations of distinct markets for warehouse services and aluminum.

-2-

This Court should affirm the District Court's straightforward application of *Aluminum III*. Because Plaintiffs did not suffer antitrust injury, there is no need for the Court to reach the other issues raised by these appeals, *i.e.*, whether a claim has been stated against three parent or affiliated corporations and whether the court below abused its discretion in denying an untimely request for leave to amend. In any event, the District Court correctly decided those other issues.

## STATEMENT OF THE ISSUES PRESENTED

1. Did the District Court correctly apply this Court's decision in *Aluminum III* in holding that Plaintiffs did not suffer antitrust injury because they did not participate in the warehouse market that was directly restrained by the alleged anticompetitive conduct?

2. Did the District Court abuse its discretion in denying the post-judgment request of the class-action Plaintiffs (the so-called "First-Level Purchasers") for leave to file a *sixth* amended complaint?

3. Did the District Court correctly dismiss the claims of the so-called "Individual Plaintiffs" against three parent or affiliated corporations, where the claims asserted against those corporations depended solely on their corporate relationships with their respective affiliates?

4. Did the District Court abuse its discretion in denying the Individual Plaintiffs' motion for leave to amend their complaint shortly before the close of

fact discovery on the grounds that they did not exercise reasonable diligence and that the untimely amendments would prejudice Defendants?

5.     Did the District Court correctly dismiss Reynolds and Southwire's claims under state antitrust laws for lack of antitrust injury and their unjust enrichment claim for failure to plead an underlying antitrust claim?

6.     Did the District Court correctly determine that Reynolds and Southwire's proposed amended complaint was futile because its mere deletion of references to a separate warehouse market did not cure the absence of any well-pled allegations of antitrust injury?

## STATEMENT OF THE CASE

### A.     Statement of Facts

This multidistrict litigation has its roots in the Great Recession.  During the financial crisis, a sharp drop in demand for aluminum led to declining prices and a massive global surplus of aluminum.  *Aluminum III*, 833 F.3d at 155.  Although the economy began to recover in 2010, aluminum production continued to outpace consumption each year, resulting in a substantial over-supply.  JA1555-56 (¶¶ 174-75); JA1778-79 (¶ 105).[1]  As a result, millions of tons of aluminum flowed into warehouses around the world.  SJA463.

---

[1] In citing the complaints in these actions, Defendants do not concede the truth of Plaintiffs' allegations.

### 1.  The Aluminum Market

Aluminum producers such as Alcoa, Rio Tinto and Rusal smelt aluminum from alumina, which is refined from bauxite ore.  JA1552-53 (¶¶ 164-66); JA1777-78 (¶¶ 100-02).  The "vast majority" of aluminum never enters a warehouse:  it is sold by smelters directly to industrial users under long-term (typically annual) supply contracts.   JA1553 (¶ 166);  JA1777-78 (¶ 102).   Smelters sell any remaining surplus aluminum to "traders and financial buyers who typically store the aluminum in warehouses" in the hopes of later selling it at a profit.  JA1553 (¶ 167); JA1778 (¶ 103).

"In general, there are two types of warehouses that stockpile aluminum: those that are affiliated with the London Metal Exchange . . . and those that are not."  *Aluminum III*, 833 F.3d at 154.  Warehouses unaffiliated with the LME generally charge lower rent than LME warehouses.  Supp. App. 32.  As a result, the majority of aluminum in storage around the world is kept in non-LME warehouses.  SJA463.  By contrast, aluminum stored in LME warehouses is used for liquidity and to support the trading of aluminum futures on the LME.  JA1787-88 (¶¶ 133, 143).

### 2.  The LME Warehouse Market

The LME is the leading exchange for trading industrial metals futures. JA1525 (¶ 76); JA1774 (¶ 87).  It offers futures contracts that require the seller of a

contract to deliver metal to the buyer on a specified date. JA1567 (¶¶ 210-11); JA1786-87 (¶¶ 132-33). These futures contacts can be settled through either the delivery of "warrants" issued by LME warehouses or an offsetting trade. JA1567 (¶¶ 211, 213-14); JA1787 (¶ 133). An LME warrant is essentially a receipt that entitles its holder to a specific lot of metal stored at one of more than 700 LME warehouse locations around the world. JA1560 (¶ 188); JA1567 (¶ 211); JA1786 (¶ 128). Fewer than one percent of LME futures contracts are settled through delivery of warrants; the remainder are settled through offsetting trades. JA1567 (¶¶ 213-14).

The LME employs a "seller's choice" model, which means that the seller of an LME futures contract is entitled to choose which warrants it delivers to settle the contract. JA1568 (¶¶ 217-18). Thus, "the seller can deliver to a buyer who is located in South Carolina a warrant for aluminum that is stored in South Korea." *Aluminum III*, 833 F.3d at 154. "For this reason, users of physical aluminum much prefer" to obtain their aluminum from sources other than LME warehouses. *Id.* As Plaintiffs acknowledge, aluminum stored in LME warehouses is considered the "suppl[y] of last resort," accessed only in times of acute shortage. JA1564 (¶ 198); JA1788 (¶ 142).

Although they typically do not do so, LME warrant holders have the right to take possession of warranted aluminum. To take possession, "the warrant holder

-6-

. . . 'cancels' the warrant, which triggers an obligation by the warehouse to load out the metal for pick up from its loading docks." *Aluminum III*, 833 F.3d at 155. A warrant holder, however, must continue to pay rent on the aluminum until the warehouse loads out the metal. *See* JA1697-99 (¶¶ 598-601). As a result, LME warehouses generally deliver metal no faster than required by the LME's rules. *See* JA788-89. As the District Court observed, "it would be in the warehouse[s'] economic self-interest" to load out metal as slowly as possible because warehouses are "in the business of collecting rent for storage; and the longer the storage, the higher the rent." JA788-89; *see also* JA1428 ("What warehouse, paid for a term of storage, would not want the longest legally permissible terms possible?").

### 3. Delivery Queues at LME Warehouses

If the volume of warrant cancellations at an LME warehouse exceeds the warehouse's load-out rate, a delivery queue forms, and the metal is loaded out in the order in which the warrants were cancelled. *Aluminum III*, 833 F.3d at 155-56. By late 2011, a substantial delivery queue for aluminum had developed at Metro's Detroit warehouses. JA1671 (¶ 530). Metro's queue had its origins in the worldwide aluminum surplus that developed during the Great Recession. JA1790 (¶¶ 149-50).

-7-

### a.   The Global Aluminum Surplus

When the Great Recession began in 2008, global demand for aluminum plummeted, but aluminum producers did not make comparable cuts in production given the high cost of shutting down and later restarting smelters. JA1552 (¶ 162); JA1781-82 (¶¶ 110-11, 114). As a result, millions of tons of surplus aluminum flowed into LME and non-LME warehouses around the world. SJA463. Indeed, "the amounts of aluminum in LME warehouses soared to all-time record levels," JA1573 (¶ 232), and a "massive" over-supply persisted throughout the relevant period. JA1629 (¶ 420); *see also* JA1555-56 (¶¶ 174-75); JA1789-90 (¶¶ 146-50). By 2011, more than 12 million metric tons of aluminum were stored in warehouses, the majority of which was stored in non-LME warehouses. SJA463; *see also* JA1681 (¶ 564). In comparison, global aluminum production in 2011 was approximately 45 million metric tons, which exceeded aluminum consumption. JA1555-56 (¶ 174).

The unprecedented worldwide aluminum surplus created a "contango" on the LME, *i.e.*, a market condition in which current aluminum prices were significantly lower than future prices. JA1702-03 (¶¶ 608-09); JA1844-45 (¶¶ 295-96). The contango, in turn, led traders to engage in "cash-and-carry" trades in which they "obtain[ed] [aluminum] at a low price now, with the bet that the price would increase as the country recovered from the recession." JA783. Banks and

other financial players were among the cash-and-carry traders that acquired large stocks of surplus aluminum because they enjoyed low capital costs and could sell the aluminum forward on the LME futures market at a profit. JA1703 (¶ 609); JA1844-45 (¶ 296).

At first, contango trading opportunities "increased demand for services of LME-warehouses" as a storage option because of the superior liquidity afforded by LME warrants. *Aluminum III*, 833 F.3d at 155; JA1789-90 (¶¶ 146-49). Over time, however, traders began to look for ways to improve their returns by lowering their storage costs. *See* JA1702-03 (¶ 608). Some traders reduced their storage costs by moving aluminum into cheaper, non-LME warehouses, while others acquired warehouse operators and moved aluminum into affiliated warehouses. *See* JA1675-76 (¶¶ 542-43) JA1681 (¶ 564); JA1819-20 (¶¶ 229-30); JA1825 (¶ 251).

### b. The Detroit Queue

During the Great Recession, large quantities of surplus aluminum flowed into Metro's Detroit warehouses because of their convenient rail connections to aluminum smelters in Canada. *See* JA1554 (¶ 170). By August 2010, more than 900,000 metric tons of aluminum were stored in Metro's Detroit warehouses, more than was stored at any other LME warehouse location. *See* JA1497 (¶ 8); JA1597-98 (¶ 304).

According to Plaintiffs, Metro sought to attract new aluminum deposits into its Detroit warehouses by offering "high incentive payments that other LME warehouses could not match." JA1498-99 (¶ 9(B)(ii)). Metro could afford to offer higher storage incentives than its competitors because its large Detroit inventory generated substantial rental income. JA1499 (¶ 9(B)(iii)); JA1822 (¶ 241). Plaintiffs thus allege that Metro achieved a "critical mass" of aluminum and "self-perpetuating market power" in Detroit: its large aluminum inventory supported large incentive payments that other warehouses allegedly could not match, and these large incentives, in turn, attracted "further metal into its warehouses." JA1497-99 (¶¶ 8, 9(B)); JA1588 (¶ 287).

Some traders that acquired warrants for aluminum stored in Metro's Detroit warehouses eventually decided to cancel those warrants and move the aluminum to cheaper storage options such as non-LME warehouses or warehouses owned by their affiliates. JA1675-76 (¶¶ 542-43); JA1681 (¶ 564); JA1700 (¶ 604); JA1787-88 (¶ 139). When those warrant cancellations exceeded Metro's load-out rate—the minimum rate required by LME rules—a substantial queue formed at Metro's Detroit warehouses. *See* JA1671 (¶ 530).

### B. Plaintiffs' Claims

According to Plaintiffs, the Detroit queue was not merely the result of "market-driven behavior by traders and warehouses." JA781. Rather, Plaintiffs

-10-

allege that three LME warehouse operators conspired with three trading firms to lengthen the Detroit queue and thereby raise a regional component of the price of aluminum in North America called the "Midwest Premium."

### 1.    The Parties

The three warehouse Defendants are Metro, Access World (USA) LLC (f/k/a Pacorini Metals USA, LLC) and Henry Bath LLC. JA1535 (¶ 92); JA1539 (¶ 107); JA1542-43 (¶ 122); JA1766 (¶ 55); JA1769 (¶ 68); JA1772 (¶ 78). The three trader Defendants are Goldman, Glencore and JPMorgan. JA1534-35 (¶¶ 87-89); JA1537 (¶ 97); JA1542 (¶ 121); JA1765-66 (¶ 52); JA1767 (¶ 58); JA1772 (¶ 77). Goldman acquired Metro in February 2010. JA1534 (¶ 86). JPMorgan acquired Henry Bath in July 2010 as a small component of a much larger commodities business it purchased from RBS.[2] JA3161 (¶ 68). Glencore acquired Pacorini later that year, in September 2010. JA1543 (¶ 125).

Plaintiffs are three sets of aluminum purchasers. The "First-Level Purchasers" or "FLPs" are four companies that allegedly made "first-level" purchases of aluminum directly from smelters. JA1519-24 (¶¶ 44-73). The FLPs seek to represent a putative class of all such first-level purchasers. *See* SJA782. The "Individual Plaintiffs" or "IPs" are Agfa, Fujifilm, Kodak and Mag

---

[2] The timing of the JPMorgan acquisition was driven by a December 2009 European Commission order requiring RBS to divest its commodities business.

Instrument. They allegedly purchased fabricated aluminum products such as lithographic foil. JA1761-65 (¶¶ 31-49); SJA1203-05 (¶¶ 34-39). And Reynolds and Southwire, which filed their complaint three years after the other Plaintiffs did, allegedly purchased aluminum from smelters as well as from Goldman and Glencore. JA3144 (¶ 4).

### 2.    The Alleged Conspiracy

Contrary to Plaintiffs' assertions, the complaints do not allege a horizontal conspiracy to "fix the price of physical aluminum." JA1466. They instead allege a purported conspiracy to lengthen the queue at Metro's Detroit warehouses, which supposedly had the *effect* of increasing the Midwest Premium.

Plaintiffs accuse Defendants of engaging in four types of anticompetitive conduct, each of which this Court has held occurred in the warehouse market:

- First, Metro allegedly offered incentive payments—in effect, upfront rent rebates—to encourage smelters and traders to deposit surplus aluminum in its Detroit warehouses. JA1678 (¶ 550); JA1821-22 (¶ 237); JA3168 (¶ 92); SJA1146-53 (¶ 385).

- Second, Defendants purportedly agreed to treat the LME's minimum load-out rate as a maximum load-out rate. JA1667-72 (¶¶ 523-31); JA1811-14 (¶¶ 210-18); JA3166-68 (¶¶ 84-91); SJA1099-1115 (¶¶ 238-82).

- Third, Glencore, Goldman and JPMorgan allegedly engaged in "excessive" warrant cancellations at Metro's Detroit warehouses. JA1684-85 (¶ 570); JA1826 (¶ 254); JA3240 (¶¶ 104-05); SJA1159-60 (¶ 407).

-12-

- Fourth, Metro allegedly "shuttled" aluminum "from one LME-certified warehouse to another." JA1680 (¶ 559); JA1824 (¶ 246); JA3245 (¶ 117).

These four types of allegedly anticompetitive conduct, Plaintiffs contend, distorted "the LME-registered warehouse services market" by generating a lengthy queue at Metro's Detroit warehouses. *See* JA1630 (¶ 421); JA1788-89 (¶ 144); JA1848-49 (¶ 314). Plaintiffs do not suggest, however, that Metro's Detroit queue restricted the availability of the *millions* of tons of surplus aluminum stored in LME and non-LME warehouses that had no queues, *see* SJA463, or the continuing flow of new aluminum produced by smelters. Nor do they explain how the Detroit queue could have forced up aluminum prices amid a massive global surplus that produced historically depressed price levels. *See* JA1555-56 (¶ 174); JA1778-79 (¶ 105). The District Court thus concluded that "[t]here are no facts sufficient to support a restraint on the actual physical supply of aluminum." JA1448.

Despite Plaintiffs' assertion that Defendants' challenged conduct resulted from a conspiracy among several warehouses and traders, Plaintiffs' own factual allegations confirm that all of the alleged conduct was fully consistent with unilateral, self-interested behavior. As the District Court found, paying incentives to attract aluminum deposits and delivering aluminum at the minimum load-out rate "would be in the warehouse defendants' economic self-interest" because warehouses are, "after all, in the business of collecting rent for storage." JA788-

-13-

89.  Similarly, traders' acquisition and cancellation of LME warrants reflected a natural effort to capitalize on the contango in the aluminum market.  *See* JA1681 (¶ 564); JA1703 (¶ 609); JA1844-45 (¶ 296).  And the so-called "shuttling" deals between Metro and various customers were consistent with Metro's self-interest in maximizing its rental income and the customers' self-interest in minimizing their storage costs.  *See* JA1580-88 (¶¶ 255-86).

### 3. Plaintiffs' Alleged Injury

Although Plaintiffs allege a conspiracy to increase warehouse queues, they do not contend that the queues injured them directly.  They do not allege, for example, that they ever stored aluminum in a warehouse with a queue, that they ever paid rent to a warehouse while their aluminum waited in a queue, or that they ever acquired or traded LME warrants.  JA1453; SA101.  Instead, Plaintiffs assert that the Detroit warehouse queue had an indirect *effect* on a component of aluminum prices through a long and attenuated causal chain.  JA1456.

### a. Aluminum Pricing

Plaintiffs allege that they purchase aluminum directly from smelters or fabricators under long-term (typically annual) supply contracts.  JA1553 (¶ 166); JA1849 (¶¶ 315, 317, 319).  Those contracts allegedly set the total or "all-in" price of aluminum as the sum of two floating components:  (i) the "LME price" and (ii) a "regional premium."  JA1556-57 (¶ 176); JA1758 (¶ 18).  The LME price is

-14-

the "cash offered price at the end of the LME's second morning ring trading session." JA1557 (¶ 177). It reflects the value of the "least valuable warrant in all the LME warehouses" because a seller of an LME futures contract typically delivers its "least valuable warrant[s]" to settle its futures contracts. JA1568 (¶ 218). During the relevant period, the least valuable warrants in the LME system were for aluminum stored at the LME warehouse with the longest delivery queue because a queue increases the warehouse rent a warrant holder must pay before it can obtain delivery of the warranted aluminum. SJA471; SJA804-05 (¶ 42).

A "regional premium" for aluminum is simply the difference between the all-in price of aluminum in a given region and the LME price. JA1557 (¶ 178). In North America, the applicable regional premium is the Midwest Premium, which is the "difference in price between what physical buyers and sellers agree to transact at for primary aluminum delivered to U.S. (Midwest) customers and the prevailing" LME price. JA1557 (¶ 179). A private company, Platts, calculates and publishes the Midwest Premium by (i) estimating the all-in price for aluminum based on a survey of spot-market participants, and (ii) subtracting the LME price from the estimated all-in price. JA1783 (¶ 118); *see also* FLP Br. at 11; IP Br. at 6-7; R&S Br. at 12-13.

### b. The Effect of Queues on Aluminum Prices

Plaintiffs assert that the queue at Metro's Detroit warehouses had the indirect effect of increasing the Midwest Premium component of the all-in price they paid for aluminum. *See* JA1627-28 (¶ 413); JA1630 (¶¶ 421-22); JA1848-49 (¶¶ 313-14). But Plaintiffs never adequately explain the relationship between the Detroit queue and *all-in* aluminum prices, as opposed to the Midwest Premium in isolation.

Although the complaints are virtually silent on this issue, a November 2013 LME report cited by Plaintiffs discusses the LME's understanding of the relationship between queues and all-in aluminum prices.[3] According to that report, "the impact of queues . . . has been not to change the absolute price of metal, *but rather to depress the LME price relative to the absolute price*, and consequently to increase the contribution of the premium to the absolute price." Supp. App. 45 (emphasis added). The LME report explains that queues depressed the LME price of aluminum because LME futures contracts typically are settled with warrants for metal stored in the warehouses with the longest queues, thus causing the LME price to reflect the value of those queue-encumbered warrants:

---

[3] *See* JA1680 (¶ 558) (citing Summary Public Report of the LME Warehousing Consultation); JA1697 (¶ 598) (same); JA1823 (¶ 245) (same); JA1839 (¶ 285) (same); JA3157 (¶ 54) (same).

> [T]he effect of queues is to create a discount between the free market price of metal, and the value of an LME warrant in a warehouse with queues. By extension, this causes the LME price to trade at a discount to the free metal price. This is then observed by the market as the free market price of metal trading at a premium to the reported LME price. Although there will always be a premium due to the "in-warehouse" nature of the LME contract . . . , the effect of the queues is to increase this premium as a proportion of the "all-in" free metal price.

Supp. App. 7.

Plaintiffs cite this LME report for the proposition that the Detroit queue raised the Midwest Premium component of the all-in price of aluminum. FLP Br. at 16 (citing Summary Public Report of the LME Warehousing Consultation at 6); IP Br. at 17 (same); R&S Br. at 17 (same). But, if the LME is correct that the Detroit queue simply "increase[d] [the] premium as a proportion of the 'all-in' free metal price," Supp. App. 7, then the queue had no effect on the total price that Plaintiffs paid.

## C.    Procedural History

This litigation began in 2013 with four groups of plaintiffs: the FLPs, the IPs, the Commercial End Users ("Commercials") and the Consumer End Users ("Consumers"). The FLPs allege that they purchased primary aluminum (*i.e.*, non-fabricated aluminum) directly from aluminum smelters. *See* FLP Br. at 10. The IPs allege that they bought fabricated aluminum from integrated aluminum producers. *See* IP Br. at 6. The Commercials allege that they purchased fabricated aluminum from suppliers such as the FLPs to make aluminum products. JA354-57

-17-

(¶¶ 18-26).  Finally, the Consumers allege that they bought consumer products made of aluminum such as canned beverages.  JA232-33 (¶¶ 17-19).  All four groups of plaintiffs assert that Defendants conspired to "manipulate the price of aluminum" by "creating long 'queues' to take aluminum out of LME-warehouses."  *Aluminum III*, 833 F.3d at 153, 155.

### 1.    *Aluminum I*:  The District Court Dismisses the Commercials and Consumers' Claims.

In *Aluminum I*, the District Court dismissed the claims of all four sets of Plaintiffs for failure to allege either antitrust standing or a plausible antitrust conspiracy.  JA761-70; JA775-91.  Although the FLPs and IPs were permitted to amend their complaints to try to cure those deficiencies, the court denied the Commercials and Consumers leave to amend because "[t]here will always be . . . more efficient enforcers" of the antitrust laws.  JA801.  The Commercials and Consumers then appealed the dismissal of their claims to this Court.

### 2.    *Aluminum II*:  The District Court Concludes That the FLPs and IPs Adequately Allege Antitrust Injury.

In response to *Aluminum I*, the FLPs and IPs filed two of the complaints at issue in these appeals:  the FLPs' Third Amended Complaint ("TAC") and the IPs' Joint Amended Complaint ("JAC").  Both complaints assert that Defendants conspired to lengthen the aluminum queue at Metro's Detroit warehouses, which

-18-

allegedly "led to increases in the spot price of physically delivered aluminum by way of increasing the Midwest Premium." JA1436-38.

The FLPs and IPs claim to have suffered antitrust injury by purchasing aluminum at prices that included an allegedly inflated Midwest Premium. JA1629-31 (¶¶ 417-25); JA1848-50 (¶¶ 309-21). Unlike a typical antitrust case, however, the FLPs and IPs acknowledge that they did not participate in the market in which the alleged anticompetitive conduct occurred. *See* JA1453. They instead contend that they suffered antitrust injury because "Defendants' conduct impaired competition among suppliers of warehouse services and this, in turn, had a predictable and foreseeable *effect* on the market for aluminum." JA1848-49 (¶ 314) (emphasis added).[4] Although the FLPs and IPs concede that they did not participate in the directly restrained warehouse market, they allege that they suffered antitrust injury under *Blue Shield of Virginia* v. *McCready*, 457 U.S. 465 (1982), because their alleged injuries in the aluminum market were "inextricably intertwined" with the injuries Defendants purportedly caused in the warehouse market. JA1453-54; JA1630 (¶ 421); JA1758-59 (¶¶ 19, 22).

---

[4] *See also* JA1565 (¶ 205) ("[A]nticompetitive behavior in the LME Aluminum Warehouse Services Market directly affects prices and the output of aluminum into the Primary Aluminum Market."); JA1630 (¶ 421) ("The anticompetitive effects of Defendants' exercise of market power in the LME-registered warehouse services market are thus directly transmitted to the Primary Aluminum Market.").

In *Aluminum II*, the District Court accepted the FLPs and IPs' "inextricably intertwined" theory of antitrust injury. The court recognized that the alleged conspiracy to lengthen the Detroit queue "was not a traditional 'price fix'—no price was fixed." JA1437. The court also characterized Plaintiffs' alleged injury as "collateral damage" and "merely [a] by-product" of the alleged conduct in the warehouse market. JA1441; JA1453. The court nonetheless held that the FLPs and IPs suffered antitrust injury because "their purchases are inextricably intertwined with the competitive landscape in which defendants' alleged scheme ultimately played out." JA1454. The court explained: "Plaintiffs are the real world users whose demand for aluminum creates the market for aluminum sales; thus, were it not for their need to use aluminum as an input in their production processes, it would not be possible for the financial trading defendants to trade aluminum as a commodity." JA1453.

### 3. *Aluminum III*: This Court Holds That the Commercials and Consumers Did Not Suffer Antitrust Injury.

After the District Court's ruling in *Aluminum II*, the Commercials and Consumers briefed their appeals from the dismissal of their actions. On the issue of antitrust injury, they made two arguments in this Court. First, they asserted that they could plead antitrust injury under *McCready* based on the same "inextricably intertwined" theory that the District Court had upheld in *Aluminum II*. SA79-80; SJA666-67; SJA748. Like the FLPs, they argued that "Plaintiffs' demand for

-20-

aluminum created the market for aluminum sales" and that "it would not be possible for the financial institution defendants to trade aluminum as a commodity" without that demand. SA74.

Second, the Commercials and Consumers contended that they suffered "traditional" antitrust injury because Defendants' conduct allegedly created a supply restraint in the aluminum market. SA84. The Consumers argued, for example, that they "suffered a textbook antitrust injury" because "Defendants colluded to restrict the deliverable supply of aluminum, which . . . raised the price of primary aluminum." SJA617. The Commercials likewise claimed that Defendants conspired to "drive up prices in the physical aluminum market, allowing them to realize a greater profit from sales of their aluminum holdings." SJA652. The Consumers and Commercials thus asserted that they had "alleged a classic supply restraint, giving rise to traditional antitrust injury," because "Defendants' practices artificially limited the supply of aluminum available to the market by trapping large quantities of it in LME warehouses." SJA734.[5]

---

[5] The Commercials and Consumers argued "that they [should] be given leave to amend to include the same allegations of antitrust injury and conspiracy the FLPs asserted in their amended complaints." SJA721; *see also* SJA660 ("Plaintiffs should be given leave to amend their complaint to include the same allegations of antitrust injury.").

In *Aluminum III*, this Court rejected both arguments, holding that the Commercials and Consumers "failed to allege (and could not allege) antitrust injury." 833 F.3d at 163. The Court began by reviewing the leading cases on antitrust injury and distilling those cases into a general rule: regardless of whether a plaintiff claims antitrust injury under a "traditional" theory or a *McCready* theory, "the putative plaintiff must be a participant in the very market that is directly restrained." *Id.* at 161. The Court concluded that the Commercials and Consumers "do not and cannot allege that they participated" in the directly restrained warehouse market. *Id.* at 162. Instead, those plaintiffs, like Plaintiffs here, "premise[d] their claim to antitrust injury solely on their purchases of aluminum and aluminum products on the physical aluminum market, where prices were allegedly *affected* by the defendants' alleged anticompetitive behavior" in the distinct warehouse market. *Id.* (emphasis added).

The Court also rejected plaintiffs' contention that they suffered antitrust injury because Defendants created a supply restraint in the aluminum market. The Court explained that the Commercials and Consumers "allege the following anticompetitive conduct: [i] the trader defendants cancelled warrants en masse; [ii] the trader defendants directed the warehouse operators to shuttle aluminum from one warehouse to another; [iii] the warehouse operator defendants treated the minimum load-out requirement as a maximum; and [iv] the warehouse operator

-22-

defendants offered incentive payments to attract more aluminum." *Id.* This Court held that "[a]ll of this conduct took place (if at all) in the LME-warehouse storage market, and *that is where the direct, immediate impact would have been felt*." *Id.* (emphasis added). Because the Commercials and Consumers never participated in the directly restrained warehouse market, the Court concluded that they did not suffer antitrust injury. *Id.* at 162-63.

### 4. *Aluminum IV*: The District Court Dismisses the FLPs' Claims Under *Aluminum III*.

When this Court issued its *Aluminum III* decision, Defendants promptly moved for judgment on the pleadings against the FLPs on the ground that they, too, did not suffer antitrust injury. The FLPs responded that *Aluminum III* did not foreclose the "inextricably intertwined" theory of antitrust injury alleged in their complaint. SA67. They also asserted that they suffered "traditional" antitrust injury as a result of an alleged supply restraint. SA68.

In *Aluminum IV*, the District Court held that *Aluminum III* forecloses both arguments. SA68. The court explained that "[t]he core of plaintiffs' claims in the TAC is the same as that which the Second Circuit considered in the indirect purchasers' complaints: that defendants' alleged shenanigans in connection with aluminum warehousing services caused a supply restraint that led to a higher Midwest Premium." SA68. The court thus held that "the general rationale of, as

well as each of these statements by, the Second Circuit are equally applicable to the FLP plaintiffs' claims."  SA80.

The District Court also rejected the FLPs' contention that they suffered "traditional" antitrust injury because "[t]here is no allegation or evidence in the record that defendants engaged in any anticompetitive conduct outside of the aluminum warehouse services market."  SA84.  Under *Aluminum III*, the court explained, "the fact that the parties may compete in a market into which competitive effects trickle down is not equivalent to competing in the market in which the anticompetitive conduct occurred (warehouse services) or the market(s) intended to be most directly affected (also warehouse services)."  SA69.

Finally, as an additional basis for its decision, the District Court found that the FLPs waited too long to assert a "traditional" theory of antitrust injury based on an alleged direct restraint of the aluminum market.  As the court explained, the FLPs "designed the TAC around a core assertion that they pay a higher Midwest Premium *because of shenanigans in aluminum warehouse services*."  SA82 (emphasis added).  The FLPs also "consistently identified the locus of defendants' anticompetitive conduct as the *aluminum warehousing services market*" at the pleadings, discovery and class-certification stages of the case.  SA70-73 (collecting statements by FLPs during litigation) (emphasis added).  The District Court held that any attempt to assert a "traditional" theory of antitrust injury based on a direct

-24-

restraint of the aluminum market "would require a fundamental alteration in their theory of the case—and it is too late for that."  SA83.

The District Court thus ruled that the FLPs' claims fail as a matter of law, whether analyzed under Rule 12(c) or Rule 56, and directed the Clerk to enter final judgment.  SA86.[6]  After final judgment was entered, SA87, the FLPs sought leave to file an amended complaint.  That motion did not identify any intervening change in the law or controlling precedent overlooked in *Aluminum IV*, nor did it provide any justification for waiting until after entry of judgment to seek leave to amend. SA107.  The court denied the FLPs' motion as untimely and futile.  SA107.

### 5. *Aluminum V*:  The District Court Dismisses the Remaining Plaintiffs' Claims Under *Aluminum III*.

When the District Court dismissed the FLPs' complaint, it also dismissed the complaints of the remaining Plaintiffs—the IPs, Reynolds and Southwire—because those Plaintiffs relied on the same allegations of anticompetitive conduct and the same alleged injury as the FLPs.  *See* SA86; SA87; SA89.  The IPs, Reynolds and Southwire responded by asking the District Court to reopen their cases because Defendants had moved only against the FLPs.  SA88-89.  The court granted that

---

[6] Because the FLPs submitted evidence that supposedly supported their alternative "traditional" theory of antitrust injury, the District Court converted Defendants' motion for judgment on the pleadings to a motion for summary judgment.  SA81 n.5.  The court held, however, that "[t]he outcome . . . would be the same whether [the motion] is analyzed under Rule 12 or 56."  SA81 n.5.

request (SA88-90) and gave those Plaintiffs an opportunity to brief, submit evidence and present oral argument on whether they suffered antitrust injury. SA93 n.2. After considering their arguments, the court held that each of those Plaintiffs lacked antitrust injury under *Aluminum III*. SA104.

### a. The IPs

Although the IPs tried to differentiate themselves from the FLPs, their complaints allege the exact same conspiracy and the exact same anticompetitive conduct: identical factual allegations are copied and pasted from one complaint to another, and even the headings in the complaints are the same. *Compare* JA1643-1706 (¶¶ 464-621) *with* JA1791-1847 (¶¶ 151-308); *see also* SA95-96. The District Court thus observed that "the primary theories alleged in both" the FLPs and IPs' complaints are identical. JA1429.

Like the FLPs, the IPs' theory of antitrust injury is that Defendants' anticompetitive conduct in the warehouse market lengthened the queue at Metro's Detroit warehouses and had the indirect effect of inflating the Midwest Premium. *See* JA1848-49 (¶ 314).[7]   Like the FLPs, the IPs allege the same four

---

[7] The IPs' memorandum in support of their JAC states: "here, the anticompetitive conduct is in the warehouse services market relating to aluminum." SJA23. The IPs also assert that Defendants' "conspiratorial mechanism—the agreement to allocate and not to compete in the market for LME warehousing services[—]underpinned Defendants' ability to hoard aluminum in key chokepoint locations . . . , causing Plaintiffs to pay higher prices for aluminum." SJA17.

anticompetitive acts by Defendants in the warehouse market: (i) cancelling warrants, (ii) offering incentive payments for aluminum deposits, (iii) shuffling aluminum between warehouses, and (iv) treating the LME's minimum load-out rate as a maximum. JA1811-29 (¶¶ 210-60); *see also* IP Br. at 16-18.[8] And like the FLPs, the IPs argue that Defendants' alleged conduct in the warehouse market "had a predictable and foreseeable *effect* on the market for aluminum." JA1848-49 (¶ 314) (emphasis added). Indeed, the IPs described the central issue in their case as "whether Defendants' anticompetitive conduct in the LME warehousing market caused Plaintiffs' injury in the physical aluminum market." SJA18.

Given that the IPs and the FLPs relied on "near verbatim" factual allegations and legal theories, the District Court held that the IPs also did not suffer antitrust injury under *Aluminum III*. SA94-104. As the court explained, the IPs "conflate experiencing some effect of the anticompetitive conduct, on the one hand, with what constitutes antitrust injury as a matter of law, on the other." SA103. Under *Aluminum III*, the court reasoned, "to state or show antitrust injury here—on these rather complicated facts—plaintiffs needed to be injured" in the directly restrained warehouse market. SA103. The court concluded that the IPs' arguments "do not

---

[8] The IPs also allege that Defendants agreed not to compete against each other in the warehouse market—alleged anticompetitive conduct that also occurred solely in the warehouse market. JA1807-11 (¶¶ 197-209).

change the fact that the anticompetitive conduct occurred in a different market" than "the physical aluminum market in which they operate." SA104.

### b. Reynolds and Southwire

Reynolds and Southwire filed a joint complaint in July 2016, two weeks before this Court decided *Aluminum III*. In filing their action, Reynolds and Southwire represented that their case "present[s] individual claims similar to those presented by" the IPs and "request[ed] assignment as a potential tag-along action in the MDL." Supp. App. 80.

Reynolds and Southwire's complaint closely mirrors those filed by the other Plaintiffs: it alleges that the *same* four types of anticompetitive acts in the *same* warehouse market supposedly had the *same* effect of inflating the Midwest Premium in the aluminum market. *See* JA3160 (¶ 64); JA3165-78 (¶¶ 80-125); JA3188-89 (¶¶ 158-59). It also asserts that Reynolds and Southwire suffered antitrust injury under *McCready* because "their purchases are inextricably intertwined with the competitive landscape in which Defendants' scheme played out." JA3145-46 (¶ 10). Indeed, many of Reynolds and Southwire's allegations were copied wholesale from the FLPs and IPs' complaints.[9] Because Reynolds and Southwire rely on "the same anticompetitive conduct and assert the same

_____

[9] *Compare*, *e.g.*, JA3163-65 (¶¶ 74, 79); JA3167-68 (¶¶ 86, 87, 89); JA3175-77 (¶¶ 114-20) *with* JA1794 (¶ 161); JA1803 (¶ 187); JA1811 (¶ 211); JA1813-14 (¶¶ 215, 218); JA1824-26 (¶¶ 246-53).

theories" as the other Plaintiffs, the District Court held that they, too, fail to allege antitrust injury.  *See* SA97.

Following the District Court's dismissal of the FLPs' complaint, Reynolds and Southwire filed a proposed amended complaint that deletes all explicit references to a distinct market for "warehouse services."[10]  Despite this cosmetic effort to create the illusion of a single market, the *substance* of Reynolds and Southwire's allegations remains unchanged:  Reynolds and Southwire continue to rely on the exact same allegations of anticompetitive conduct asserted by the other Plaintiffs.  *See* JA3230-49 (¶¶ 69-128).  As the District Court observed, "all of the anticompetitive conduct at the heart of the proposed amendment occurs in the warehouse services and warrant trading markets—markets in which plaintiffs do not allege they participated."  SA100.  The court thus held that "it would be futile to allow the amendment proposed by" Reynolds and Southwire.  SA104.

## SUMMARY OF ARGUMENT

In *Aluminum III*, this Court synthesized the leading cases on antitrust injury and articulated a general rule that applies regardless of whether the plaintiff relies on a "traditional" or an "inextricably intertwined" theory of antitrust injury:  "the

---

[10] The proposed amended complaint retains the same substantive paragraphs describing the warehouse market.  *Compare* JA3225-27 (¶¶ 53-60) *with* JA3158-60 (¶¶ 56-63).  It simply deletes the heading "THE LME WAREHOUSE MARKET" and strikes two subsequent paragraphs under the subheading "Relevant LME Warehouse Market For Purposes Of The Complaint."

putative plaintiff must be a participant in the very market that is directly restrained." 833 F.3d at 161. The Court then applied that rule to precisely the same allegations of anticompetitive conduct at issue in these appeals. *Id*. at 162. According to this Court, "[a]ll of this conduct took place (if at all) in the *LME-warehouse storage market*, and that is where the direct, immediate impact would have been felt." *Id*. (emphasis added). Because the Commercials and Consumers did not allege that they participated in the directly restrained warehouse market, this Court held that "they did not (and could not) suffer antitrust injury." *Id*. at 154. This Court thus rejected the Commercials and Consumers' claim of antitrust injury based on "purchases of aluminum and aluminum products on the physical aluminum market, where prices were allegedly *affected* by the defendants' alleged anticompetitive behavior." *Id*. at 162 (emphasis added).

Plaintiffs here likewise did not suffer antitrust injury under *Aluminum III* because they rely on the *same* allegations of anticompetitive conduct as the Commercials and Consumers in the *same* warehouse market—a market in which Plaintiffs did not participate. Moreover, the Commercials and Consumers argued in *Aluminum III* that, if given leave to amend, they would adopt the exact same allegations of antitrust injury that the FLPs and IPs had asserted after conducting discovery in those cases. This Court nevertheless held that the Commercials and Consumers could not establish antitrust injury based on their purchases of

-30-

aluminum at prices that supposedly were *affected* by Defendants' conduct in the warehouse market. *Id*. at 162. That decision applies equally to these appeals.

All three sets of Plaintiffs here make two common arguments in an effort to sidestep *Aluminum III*. Neither has merit.

*First*, Plaintiffs attempt to distinguish *Aluminum III* on the ground that they purchased aluminum "directly" from aluminum producers, whereas the Commercials and Consumers bought aluminum "indirectly" from intermediaries such as the FLPs. But that is a distinction without a difference: like the Commercials and Consumers, Plaintiffs here lack antitrust injury because they did not participate in the directly restrained market. What is more, the Commercials and Consumers asserted their claims for damages under *state* antitrust statutes that recognize no distinction between "direct" and "indirect" purchasers. Plaintiffs thus rely on an irrelevant distinction that had no bearing on this Court's ruling in *Aluminum III*.

*Second*, Plaintiffs assert that they and the trader Defendants participated in the aluminum market, whereas the Commercials and Consumers "disavow[ed] participation" in that market. *Id*. at 161. But Plaintiffs are mistaken: the Commercials and Consumers did *not* disavow participation in the aluminum market. Rather, as this Court observed, "[t]hey premise[d] their claim to antitrust injury solely on their purchases of aluminum and aluminum products *on the*

-31-

*physical aluminum market*." *Id*. at 162 (emphasis added). Moreover, the *Aluminum III* test is not whether the plaintiff participated in a market in which a defendant also participated, but whether the plaintiff participated "in the very market that the defendants directly restrained." *Id*. Like the Commercials and Consumers, Plaintiffs cannot satisfy that test because they never participated in the warehouse market that Defendants are accused of directly restraining.

Beyond those two common arguments, Plaintiffs make a series of individual arguments as to why they purportedly suffered antitrust injury under *Aluminum III*. Those arguments fare no better.

1.  The FLPs attempt to manufacture antitrust injury by shifting from an "inextricably intertwined" theory of antitrust injury to a "traditional" theory. The FLPs argue that they have "traditional-antitrust standing" as "Defendants' competitors and consumers in the physical-aluminum market." FLP Br. at 32. The District Court, however, did not abuse its discretion in holding that the FLPs' new theory of antitrust injury "would require a fundamental alteration in their theory of the case—and it is too late for that." SA83. Furthermore, even if the FLPs had timely asserted such a theory, the court correctly rejected the FLPs' "traditional" theory of antitrust injury because the FLPs continue to rely on the exact same allegations of anticompetitive conduct that this Court rejected as a basis for antitrust injury in *Aluminum III*. SA83-84. In addition, the FLPs' contention that

-32-

they competed with Defendants to acquire aluminum from smelters cannot establish antitrust injury as a matter of law.  Even if it were true that competition from Defendants made it more costly for the FLPs to buy aluminum, the FLPs would be complaining about an *increase* in competition, not a *restraint* of competition.

Nor was it error for the District Court to deny the FLPs' post-judgment request to file a *sixth* amended complaint.  After the District Court dismissed their action and entered final judgment, the FLPs filed a combined motion to vacate the judgment under Rule 59(e) and for leave to amend their complaint.  It is well settled, however, that Rule 59(e) cannot be used to present arguments that could have been presented before entry of final judgment.  The District Court did not abuse its discretion in determining that the FLPs already had been given ample opportunities to state a claim and that it was far too late in the litigation for them fundamentally to alter their case.  The court also properly found that the proposed amendment was futile:  because the amended complaint still relied on the same alleged anticompetitive conduct—already held to directly restrain competition only in the warehouse market—the FLPs could not plead around *Aluminum III* simply by omitting their explicit allegation of a distinct warehouse market.

2.  The IPs argue that Defendants "conspired to fix physical aluminum prices" and that they suffered antitrust injury "as purchasers of a price-fixed

-33-

product." IP Br. at 2. But, as the District Court recognized, the alleged "conspiracy was not a traditional 'price fix'—no price was fixed." JA1437. Rather, the IPs contend that Defendants engaged in anticompetitive conduct in the *warehouse* market that supposedly affected a component of prices in the *aluminum* market. In *Aluminum III*, this Court held that aluminum purchasers that did not participate in the directly restrained warehouse market cannot establish antitrust injury by claiming that the prices they paid for aluminum were *affected* by Defendants' alleged restraint of the warehouse market.

The District Court also correctly dismissed the IPs' claims against three parent or affiliated corporations and denied the IPs' belated request to amend their complaint near the close of fact discovery. The IPs' complaint alleges no facts that connect the three parent or affiliated corporations to the purported conspiracy; instead, it relies solely on those corporations' relationships with their respective affiliates. The IPs also failed to establish good cause for their untimely request to modify the governing scheduling order and amend their complaints. As the District Court explained, "[n]ot only would allowing the amendments seriously prejudice defendants and cause substantial delays to the existing schedule, but plaintiffs . . . did not exercise reasonable diligence in putting these [amendments] before the Court in a timely manner." SA47.

-34-

3. Reynolds and Southwire insist that their claims are different because they bought some of their aluminum directly from two trader Defendants. But that fact does not change the result under *Aluminum III*. Like the Commercials and Consumers, Reynolds and Southwire did not participate in the directly restrained warehouse market, and they cannot claim antitrust injury based on purchases of aluminum in "the physical aluminum market, where prices were allegedly *affected* by defendants' alleged anticompetitive behavior." *Aluminum III*, 833 F.3d at 162 (emphasis added). The District Court also correctly held that Reynolds and Southwire's proposed amended complaint did not remedy this fatal flaw: the "fundamental mistake" Reynolds and Southwire make—and "do not correct" in their amendment—"is to conflate experiencing some effect of anticompetitive conduct, on the one hand, with what constitutes antitrust injury as a matter of law, on the other." SA103. Because they did not participate in the directly restrained warehouse market, Reynolds and Southwire's proposed amended complaint did not allege antitrust injury under *Aluminum III*.

## ARGUMENT

### I. The Dismissal of the FLPs' Action Should Be Affirmed.

In *Aluminum III*, this Court decided the dispositive issue raised by the FLPs' appeal: whether aluminum purchasers suffered antitrust injury as a result of an alleged conspiracy to create a queue at Metro's Detroit warehouses. This Court

-35-

held that the Commercials and Consumers—which relied on the same allegations of anticompetitive conduct and the same theory of injury as the FLPs—"failed to allege (and could not allege) antitrust injury." 833 F.3d at 163. In dismissing the FLPs' action, the District Court correctly recognized that "the general rationale of, as well as each of the[] statements by, the Second Circuit are equally applicable to the FLP plaintiffs' claims." SA80. None of the FLPs' attempts to distinguish *Aluminum III* or to manufacture a new theory of antitrust injury has merit.

### A. *Aluminum III* Controls and Requires Dismissal of the FLPs' Action.

"Antitrust law has long recognized that defendants who may have violated a provision of the antitrust statutes are not liable to every person who can persuade a jury that he suffered a loss in some manner that might conceivably be traced to the conduct of the defendants." *Reading Indus., Inc.* v. *Kennecott Copper Corp.*, 631 F.2d 10, 12 (2d Cir. 1980) (internal quotation marks omitted). Instead, private antitrust actions are limited by the doctrine of "antitrust standing," which guards against "over-broad" availability of treble-damages actions that "could result in 'overdeterrence,' imposing ruinous costs on antitrust defendants, severely burdening the judicial system and possibly chilling economically efficient competitive behavior." *Greater Rockford Energy & Tech. Corp.* v. *Shell Oil Co.*, 998 F.2d 391, 394 (7th Cir. 1993).

-36-

To establish antitrust standing, a private antitrust plaintiff must demonstrate both (i) "that it suffered a special kind of 'antitrust injury,'" and (ii) that it "is an 'efficient enforcer' of the antitrust laws." *Gatt Commc'ns, Inc.* v. *PMC Assocs., LLC*, 711 F.3d 68, 76 (2d Cir. 2013) (internal quotation marks omitted). These appeals involve the first requirement—antitrust injury.[11] To satisfy that requirement, a private antitrust plaintiff must participate in the directly restrained market. *See*, *e.g.*, *Aluminum III*, 833 F.3d at 161; *Hughes* v. *Tobacco Inst., Inc.*, 278 F.3d 417, 423 (5th Cir. 2001) ("Parties whose injuries . . . are experienced in another market do not suffer antitrust injury."); *Serpa Corp.* v. *McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999) ("Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury."); *Am. Ad Mgmt., Inc.* v. *Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999) ("Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained.").

In a typical antitrust action, both the plaintiff and the defendant participate in the market that is directly restrained, such as when the plaintiff is a consumer or competitor of the defendant in that market. *See McCullough* v. *Zimmer, Inc.*, 382

---

[11] Although these appeals do not present the question of whether Plaintiffs are "efficient enforcers" of the antitrust laws, Defendants would expect to show that Plaintiffs do not satisfy that requirement in any further proceedings in the District Court.

F. App'x 225, 229 (3d Cir. 2010); *see also Aluminum III*, 833 F.3d at 158 ("Generally, only those that are participants in the defendants' market can be said to have suffered antitrust injury."). A plaintiff that participates in the directly restrained market as the consumer or competitor of the defendant asserts what the District Court called "traditional" antitrust injury. SA104. There is, however, a "narrow exception to th[is] market participant requirement," derived from the Supreme Court's *McCready* decision. *Am. Ad Mgmt.*, 190 F.3d at 1057 n.5. That exception applies if a plaintiff's injury is "inextricably intertwined" with the injuries of the defendant's consumers or competitors. To fall within that exception, however, a plaintiff must show that the defendant utilized it "as a fulcrum, conduit or market force to injure" the defendant's consumers or competitors. *Southaven Land Co.* v. *Malone & Hyde, Inc.*, 715 F.2d 1079, 1086 (6th Cir. 1983). The District Court referred to this theory of antitrust injury as "*McCready*" or "inextricably intertwined" antitrust injury. SA104.

In *Aluminum III*, this Court summarized the leading cases on antitrust injury (833 F.3d at 157-61) and then distilled that case-law into a general rule that applies regardless of whether the plaintiff relies on a "traditional" or a "*McCready*" theory of antitrust injury:

> The upshot is that *to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained*. Usually, that market is the one in which the defendant operates, such as when the plaintiff is a competitor or consumer of the defendant, but

sometimes the defendant will corrupt a separate market in order to achieve its illegal ends, in which case the injury suffered can be said to be "inextricably intertwined" with the injury of the ultimate target. *Regardless, antitrust injury is suffered by participants in the restrained market (or markets).*

*Id*. at 161 (emphasis added); *see also id.* (antitrust injury requires "that the putative plaintiff participate in the market that is directly manipulated by the collusive conduct").

Applying that general rule, this Court held that the Commercials and Consumers "lack antitrust standing on the ground that they did not (and could not) suffer antitrust injury." *Id*. at 154. The Court reasoned that all of the anticompetitive conduct attributed to Defendants "took place (if at all) in the LME-warehouse storage market, *and that is where the direct, immediate impact would have been felt*." *Id.* at 162 (emphasis added). The Commercials and Consumers, however, "do not and cannot allege that they participated in that market." *Id.* Instead, those plaintiffs "premise[d] their claim to antitrust injury solely on their purchases of aluminum and aluminum products on the *physical aluminum market*, where prices were allegedly *affected* by the defendants' alleged anticompetitive behavior." *Id.* (emphasis added).

The same reasoning requires dismissal of the FLPs' action. Although the FLPs contend that they suffered antitrust injury because Defendants "created an artificial scarcity in the *physical-aluminum market*," FLP Br. at 34 (emphasis

-39-

added), they allege that Defendants "used the LME warehouses as the mechanism" to carry out the alleged conspiracy.  JA1644 (¶ 469).[12]  Thus, like the Commercials and Consumers, the FLPs did not suffer antitrust injury because "they do not and cannot allege that they participated" in the directly restrained warehouse market.  *Aluminum III*, 833 F.3d at 162.

Any other conclusion would conflict with *Aluminum III* because the FLPs contend that they were injured by exactly the same four types of anticompetitive conduct at issue in *Aluminum III*.  There, the Commercials and Consumers argued that they paid inflated prices for aluminum and aluminum products because:

> [i] the trader defendants cancelled warrants en masse; [ii] the trader defendants directed the warehouse operators to shuttle aluminum from one warehouse to another; [iii] the warehouse operator defendants treated the minimum load-out requirement as a maximum; and [iv] the warehouse operator defendants offered incentive payments to attract more aluminum.

*Id*.  Likewise here, the FLPs claim that they paid higher prices for aluminum because  Defendants  [i] "strategically  cancell[ed]  warrants,"  [ii] "shift[ed] aluminum  inventories  among  LME-certified  warehouses,"  [iii] "treated  the minimum  [load-out  rate]  as  a  maximum,"  and  [iv] "offered  extraordinary incentives to producers to place their aluminum in LME warehouses."  FLP Br.

---

[12]  *See also* SA70 ("Plaintiffs have consistently identified the locus of defendants' anticompetitive conduct as in the aluminum warehousing services market."); FLP Br. at 55 (Defendants engaged in "warehouse-storage market manipulation").

-40-

at 15-17. This Court already has held that all of this alleged conduct (if it in fact occurred) would have directly restrained the warehouse market, not the aluminum market. *Aluminum III*, 833 F.3d at 162. Thus, just like the Commercials and Consumers, the FLPs did not suffer antitrust injury because they did not "participate in the very market that the defendants directly restrained." *Id.*

The FLPs counter that *Aluminum III* is distinguishable because they purchased their aluminum directly from smelters and thus were the "first" to pay an allegedly inflated Midwest Premium. FLP Br. at 55. By contrast, the FLPs argue, the Commercials were indirect purchasers that allegedly paid an inflated Midwest Premium when they bought fabricated aluminum from the FLPs, and the Consumers were located even further down the distribution chain. *See id*; *supra* at 17-18. While factually correct, that distinction is legally irrelevant and was not the basis for this Court's decision in *Aluminum III*. This Court's ruling turned on whether the plaintiffs participated in the directly restrained market, not on whether they were direct or indirect purchasers in that market. *See* 833 F.3d at 161-63.[13] Furthermore, given their position on the distribution chain, the Commercials and

---

[13] *See also Nypl* v. *JPMorgan Chase & Co.*, 2017 WL 1133446, at *5 (S.D.N.Y. Mar. 24, 2017) ("Plaintiffs attempt to distinguish *Aluminum III* on the ground that they purchased foreign currency directly from Defendants, whereas *Aluminum III* involved indirect purchasers. The relevant inquiry is not whether Defendants directly transacted with Plaintiffs, but whether Defendants directly restrained the market in which Plaintiffs participated.").

Consumers did not seek damages under *federal* antitrust law, which limits damages actions solely to "direct" purchasers. *See Ill. Brick Co.* v. *Illinois*, 431 U.S. 720 (1977).[14]  Instead, they sought damages "under the laws of states that allow claims by indirect purchasers."  SJA720; *see also Aluminum III*, 833 F.3d at 158.  Under those so-called "*Illinois Brick* repealer" statutes, "an indirect purchaser of goods or services is deemed to participate as a customer in the relevant market and thus may suffer a cognizable antitrust injury."  *In re Napster, Inc. Copyright Litig.*, 354 F. Supp. 2d 1113, 1125 (N.D. Cal. 2005).  Because the Commercials and Consumers sued under state antitrust statutes that eliminate the distinction between direct and indirect purchasers, this Court placed no weight on that distinction in affirming the dismissal of those claims in *Aluminum III*.  The Court's ruling rests instead on the distinction between those that participated in the directly restrained warehouse market and those that did not.  833 F.3d at 161-63.[15]

Although the FLPs assert that the Commercials and Consumers "disavowed" participation in the aluminum market, FLP Br. at 37, that assertion is plainly

---

[14] Indirect purchasers, however, are permitted to sue for injunctive relief under federal antitrust law—something they could not do if their status as indirect purchasers deprived them of antitrust injury.  *See Lotes Co.* v. *Hon Hai Precision Indus. Co.*, 753 F.3d 395, 413 n.7 (2d Cir. 2014).

[15] The mere fact that the Commercials made their purchases a single step below the FLPs on the aluminum distribution chain could not possibly divest the Commercials of antitrust injury under state statutes that were intended to "repeal" *Illinois Brick*'s indirect-purchaser rule for purposes of state antitrust law.

inaccurate. In *Aluminum III*, this Court stated that the Commercials and Consumers disavowed participation in the market that allegedly was directly restrained by Defendants' supposedly collusive conduct—the warehouse market. 833 F.3d at 161-62. Far from suggesting that the Commercials and Consumers disclaimed participation in the aluminum market, this Court recognized that those plaintiffs "premise[d] their claim to antitrust injury solely on their purchases of aluminum and aluminum products *on the physical aluminum market*." *Id*. at 162 (emphasis added). The Court further acknowledged that the Commercials and Consumers' theory of antitrust injury was that "defendants increased the Midwest Premium, and thereby the price for primary aluminum." *Id.* at 163. That is precisely the same theory of antitrust injury asserted by the FLPs. *See* FLP Br. at 37 ("[FLPs] allege antitrust injury because . . . they participated in the physical-aluminum-market in which Defendants intended to inflate a price input, the Midwest Premium.").

In sum, *Aluminum III* controls this appeal. This Court distilled a general rule of antitrust injury from the case-law (833 F.3d at 161) and applied that rule to the same allegations made by the FLPs here—that Defendants *directly restrained* the warehouse market and thereby *affected* prices in the aluminum market. *Id*. at 162. The Court held that the plaintiffs there could not allege antitrust injury because they did not participate in the directly restrained warehouse market. *Id.* at 163.

-43-

The FLPs urge this Court to apply the *Aluminum III* rule to an indistinguishable set of factual allegations, and yet reach a different result. This Court should decline that invitation in effect to overrule *Aluminum III*. *See Jones* v. *Coughlin*, 45 F.3d 677, 679 (2d Cir. 1995) ("A decision of a panel of this Court is binding unless and until it is overruled by the Court *en banc* or by the Supreme Court.").

### B. The FLPs Cannot Establish Antitrust Injury Under an "Inextricably Intertwined" Theory.

Although the FLPs litigated this case for years based on a *McCready* "inextricably intertwined" theory of antitrust injury until *Aluminum III* was decided, they now relegate that theory to an afterthought. *See* FLP Br. at 58. In a single paragraph, they argue that, "as the first parties to pay a premium that is determined based on market transactions in which they participate, FLPs were 'the very means' by which the price inflation was effectuated and have standing under *McCready*." *Id.* (citations omitted). In *Aluminum III*, the Commercials and Consumers likewise argued that "their role in creating demand for physical aluminum makes them 'inextricably intertwined' with the anticompetitive scheme," and this Court squarely rejected that argument. 833 F.3d at 162-63.

The result here is no different simply because the FLPs "are *the first parties to pay* the Midwest Premium." FLP Br. at 55. As explained above, the Commercials and Consumers' positions on the distribution chain were irrelevant to this Court's ruling in *Aluminum III*. *See supra* at 41-42. This Court instead

-44-

rejected the Commercials and Consumers' *McCready* theory of antitrust injury because they did not "participate in the very market that the defendants directly restrained." *Aluminum III*, 833 F.3d at 162.

### C. The FLPs Cannot Establish "Traditional" Antitrust Injury.

Having largely abandoned their *McCready* theory of antitrust injury, the FLPs' principal argument on appeal is that they suffered "traditional" antitrust injury "based upon injuries suffered as Defendants' competitors and consumers" in the aluminum market. FLP Br. at 34. They attempt to evade *Aluminum III* by contending "that the physical-aluminum and warehouse-services markets function as a single market." *Id*. at 60. They also assert that "Defendants acted anti-competitively in the physical-aluminum market." *Id*. at 44-45. This new theory of antitrust injury should be rejected for multiple reasons.

### 1. *Aluminum III* Forecloses the FLPs' Claim of "Traditional" Antitrust Injury.

The FLPs argue that *Aluminum III* addressed only a *McCready* theory of antitrust injury. *Id*. at 37. That argument is mistaken. In *Aluminum III*, the Commercials and Consumers asserted both a *McCready* and a "traditional" theory of antitrust injury. Their traditional theory was the same theory now asserted by the FLPs, namely, that Defendants' warehouse-related conduct created a supply restraint in the aluminum market:

- The Commercials and Consumers asserted that they suffered "*traditional antitrust injury*" because "Defendants' practices artificially limited the supply of aluminum available to the market by trapping large quantities of it in LME warehouses." SJA734 (emphasis added).

- The Consumers added that they "suffered a *textbook antitrust injury*" because "Defendants colluded to restrict the deliverable supply of aluminum, which . . . raised the price of primary aluminum." SJA617 (emphasis added).

- The Commercials similarly emphasized that Defendants conspired to "drive up prices in the physical aluminum market, allowing [Defendants] to realize a greater profit from sales of their aluminum holdings." SJA652.

*See also* SJA733-37; SA84-85 (collecting additional citations from Commercials and Consumers' complaints).

This Court expressly acknowledged the Commercials and Consumers' arguments that "defendants conspired to manipulate . . . the 'Midwest Premium'" and "intended to corrupt the market for primary aluminum." *Aluminum III*, 833 F.3d at 155, 162. It nevertheless concluded that the Commercials and Consumers suffered no antitrust injury because they did not participate in the directly restrained warehouse market. *Id.* at 162. Accordingly, even though the Commercials and Consumers requested leave to amend their complaints to adopt

the FLPs' allegations of antitrust injury, *see* SA76,[16] this Court held that the Consumers and Commercials "could not allege" antitrust injury and affirmed the denial of leave to amend. *Aluminum III*, 833 F.3d at 163. That ruling applies with equal force to the FLPs' claim of "traditional" antitrust injury.

Despite this Court's ruling in *Aluminum III*, the FLPs insist that Defendants directly restrained the aluminum market. FLP Br. at 44-54. But the FLPs continue to rely on the same four types of alleged anticompetitive conduct that the Commercials and Consumers asserted in *Aluminum III*. *Id*. at 15-17. This Court already held that "[a]ll of this conduct took place (if at all) in the LME-warehouse storage market, and that is where the direct, immediate impact would have been felt." *Aluminum III*, 833 F.3d at 162. The District Court thus correctly found that "there is no allegation or evidence in the record that defendants engaged in any anticompetitive conduct outside of the aluminum warehouse services market." SA84. As the District Court stated, this Court's "description of the core allegations of the conduct at issue in [*Aluminum III*] could be lifted out wholesale and applied to the [FLPs'] TAC." SA80. The FLPs cannot avoid controlling circuit precedent

---

[16] *See also* SJA660 ("[T]he FLPs successfully alleged an antitrust injury. Plaintiffs should be given leave to amend their complaint to include the same allegations of antitrust injury."); SJA721 (Commercials and Consumers should "be given leave to amend to include the same allegations of antitrust injury and conspiracy the FLPs asserted in their amended complaints").

-47-

simply by disagreeing with this Court's conclusion that the same alleged conduct would have directly restrained the warehouse market, not the aluminum market.

### 2. The FLPs' "Traditional" Theory of Antitrust Injury Is Untimely.

Until *Aluminum III* was decided, the FLPs pursued a single theory of antitrust injury: that Defendants directly restrained the warehouse market by conspiring to lengthen warehouse queues, which, in turn, affected prices in the aluminum market. In reaction to this Court's decision, however, the FLPs now assert a very different theory of antitrust injury: that Defendants directly restrained the aluminum market because "the physical-aluminum market . . . , together with the warehouse-services market, forms 'one market'" and "[a]ny perceived dichotomy between the physical and warehouse-services markets is unfounded." FLP Br. at 61-62.

This new "one market" theory—that Defendants directly restrained the aluminum market, which includes the warehouse market—represents an abrupt change from the theory that the FLPs litigated through the end of fact discovery. The District Court thus correctly rejected the FLPs' belated attempt to advance this new theory of antitrust injury because it "would require a fundamental alteration in their theory of the case—and it is too late for that." SA83.

### a. The FLPs Allege Separate Markets for Warehouse Services and Aluminum.

The FLPs' own complaint is incompatible with their belated assertion of a single market that includes both aluminum and warehouse services. The TAC alleges that "[t]here are two relevant markets here. One is the market of 'services for aluminum stored in LME warehouses in North America' . . . . The second is the market for primary aluminum in North America." JA1494 (¶ 2); *see also* JA1550-52 (¶¶ 155-63). Consistent with their complaint, the FLPs' economic expert opined that "LME warehouse services are a relevant antitrust product market." SJA801; *see also* SJA805.

Any suggestion that the aluminum and warehouse markets are one and the same defies economic sense. A relevant product market includes "all products reasonably interchangeable by consumers for the same purposes." *United States* v. *Am. Express Co.*, 838 F.3d 179, 196 (2d Cir. 2016) (internal quotation marks omitted). The TAC alleges that "[t]he provision of LME warehouse *services* . . . includes . . . loading aluminum into the warehouse, warranting the aluminum, loading the aluminum out of the warehouse, dealing with prospective and actual customers, and maintaining proper storage conditions." JA1564 (¶ 200) (emphasis added). Needless to say, consumers cannot substitute physical aluminum for those services. *See Aluminum III*, 833 F.3d at 161-62 (distinguishing purchasers "of aluminum and aluminum products on the physical aluminum market" from users of

-49-

warehouse services that "store aluminum in the defendants' warehouses" and "trade aluminum futures").

Recognizing the implausibility of a single market, the FLPs assert that "the markets here are at least related." FLP Br. at 59.[17] But that assertion does not negate—and, in fact, confirms—the existence of two distinct markets. Nor does it distinguish this case from *Aluminum III*, where the Commercials and Consumers also argued that the warehouse and aluminum markets are "related." *See* SJA749 ("[B]oth the Commercial and Consumer End Users are *purchasers in the necessarily related primary aluminum market*."). Even if those markets are related, *Aluminum III* holds that the alleged anticompetitive conduct directly restrained the warehouse market, not the aluminum market. 833 F.3d at 162-63.

---

[17] In so arguing, the FLPs rely on *Loeb Industries, Inc.* v. *Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2001). But that decision did not discuss antitrust injury at all. Rather, the Seventh Circuit addressed whether the trial court properly "dismissed the claims of each of the plaintiffs either on the ground that their claims were barred by the indirect purchaser rule of *Illinois Brick* . . . or on the ground that their injuries were too remote and speculative under *Associated General Contractors of Cal., Inc. v. California State Council of Carpenters*." 306 F.3d at 475 (citations omitted). Under Second Circuit law, the latter "remoteness" concerns relate to the "efficient enforcer" requirement of antitrust standing, not the "antitrust injury" requirement. *See Gatt*, 711 F.3d at 76-79. Thus, although the Commercials and Consumers cited *Loeb* in their appeal brief, *see* SJA753-54, this Court had no reason to cite—and did not cite—*Loeb* in *Aluminum III*.

### b. The FLPs Allege Conduct That Directly Restrained the Warehouse Market, Not the Aluminum Market.

Before *Aluminum III*, the FLPs consistently argued that Defendants *restrained* the warehouse market and thereby *affected* prices in the aluminum market. According to the FLPs, the sole "mechanism" that Defendants supposedly used to restrain the warehouse market was the queue at Metro's Detroit warehouses. SJA790-91; JA1644 (¶ 469). Thus, as recently as their reply in support of class certification, filed four days before *Aluminum III* was decided, the FLPs asserted that this case "is—and always has been—about the [Detroit] queue":

> From the very start of this case, Plaintiffs have alleged that the long queue in Detroit was the problem. This case is—and always has been—about the queue. Plaintiffs' theory of liability is the same as at the start of the case: the queue in Detroit caused Plaintiffs to pay more than they otherwise would have for physical aluminum.

SJA790-91; *see also* SA783 (Defendants "caus[ed] inflation of the MWP . . . via manipulation of LME warehouse queues").

Consistent with that theory of liability, the FLPs' class-certification experts focused solely on alleged anticompetitive conduct in the warehouse market. One of their experts opined that "Defendants' coordinated conduct *reduced competition in the markets for LME warehouse services*, which had the *effect* of increasing the price of aluminum purchased by Plaintiffs." SJA798 (emphasis added). Their other expert similarly asserted that, "by creating load-out queues, the *collusive*

-51-

*exercise of market power in the LME warehouse market* by Defendants directly caused the Midwest Premium to rise."  SJA805 (emphasis added).

The FLPs' exclusive focus on an alleged restraint of the *warehouse* market rather than a direct restraint of the *aluminum* market was not an accident; it was a deliberate strategy.  Had the FLPs argued that Defendants raised aluminum prices by directly restraining the supply of aluminum, they would have run headlong into the stubborn fact that the Great Recession produced a massive worldwide surplus of aluminum and historically low aluminum prices.  *See* JA1555-56 (¶¶ 174-75); JA1790 (¶ 149).  Indeed, the FLPs themselves acknowledge that "there [was] a substantial over-supply of aluminum," with production exceeding consumption each year between 2008 and 2013.  JA1555-56 (¶¶ 174-75); *see also* FLP Br. at 19. The District Court therefore recognized that "[t]here are no facts sufficient to support a restraint on the actual physical supply of aluminum."  JA1448.

Equally important, any attempt to argue that Defendants directly restrained the supply of aluminum would have contradicted the manipulation theory at the heart of the FLPs' class-certification motion.  Although the FLPs now argue that Defendants restrained aluminum supply by trapping metal in Metro's Detroit warehouses, they advanced a different theory before this Court decided *Aluminum III*.  At the class-certification stage, the FLPs relied on a manipulation theory based on the "unique role" that queues supposedly play in determining the

-52-

Midwest Premium.  JA1436.  The FLPs and their expert argued that Defendants

manipulated the Midwest Premium by engaging in "excess warrant cancellations"

that had the dual effects of lengthening the Detroit queue but also *reducing* the

volume of aluminum stored in Metro's Detroit warehouses by producing additional

load outs.  *See* SJA351; SJA367; SJA817.[18]  The FLPs' expert thus opined that the

net effect of the supposed conspiracy was to *reduce* the total amount of aluminum

stored in Metro's Detroit warehouses—the exact opposite of a supply restraint:

> Q.  So according to your work . . . , if not for the alleged
> conspiracy, more aluminum would have stayed in the Metro Detroit
> warehouse[s] for a longer period of time; correct?
>
> A.  Correct.
>
> . . . .
>
> Q.  And so according to your work . . . , the effect of the alleged
> conspiracy was to reduce the amount of aluminum inventory in the . . .
> Detroit warehouses during the class period; correct?
>
> . . . .
>
> A.  Correct.

SJA367; *see also* SJA366-67; SJA412-13.  There is a fundamental disconnect

between the FLPs' economic analysis at class certification and their newly minted

---

[18] According to the FLPs' expert, the alleged conspiracy had no effect on the amount of aluminum loaded *into* Metro's Detroit warehouses, but increased the amount loaded *out* by producing more warrant cancellations, which trigger the *removal* of aluminum from an LME warehouse.  SJA367.  More warrant cancellations meant that more aluminum was loaded out of Metro's Detroit warehouses than otherwise would have occurred.

-53-

theory on appeal of a "classic supply-restriction scheme" (FLP Br. at 34) that supposedly created an aluminum shortage amid the largest aluminum surplus the world ever has seen. This disconnect underscores the extent to which the FLPs have attempted to change their theory of the case in reaction to *Aluminum III*.

*       *       *

For all of these reasons, the District Court correctly held that the FLPs' claim of "traditional" antitrust injury based on a direct supply restraint in the aluminum market "would require a fundamental alteration in their theory of the case—and it is too late for that." SA83. The court stressed that the FLPs "designed the TAC around a core assertion that they pay a higher Midwest Premium because of shenanigans in aluminum warehouse services." SA82. The court thus rejected the FLPs' attempt, years into the litigation, to "alter their allegations of wrongdoing so significantly as to claim that somehow anticompetitive conduct in warehouse services" directly restrained a different market. SA82.

The District Court did not abuse its discretion in determining that the FLPs' attempt to change their theory of the case after the close of fact discovery was untimely. *See*, *e.g.*, *Dziedzic* v. *State Univ. of N.Y. at Oswego*, 648 F. App'x 125, 128 n.2 (2d Cir. 2016) ("[T]he district court need not have considered [plaintiff's] claims . . . raised for the first time in opposition to summary judgment"); *Donovan*

-54-

v. *Centerpulse Spine Tech Inc.*, 416 F. App'x 104, 107 (2d Cir. 2011) ("We . . . need not consider plaintiffs' . . . argument, because it was untimely raised."); *Enzo Biochem, Inc.* v. *Amersham PLC*, 981 F. Supp. 2d 217, 224 (S.D.N.Y. 2013) ("A plaintiff may not pivot from its stated claims to new ones at the summary judgment stage simply because it inserted a few vague catch-all phrases into its pleadings.").[19]

### 3. The FLPs' Theory of "Traditional" Antitrust Injury Fails for Additional Reasons.

Even if the FLPs had timely asserted it, their new "traditional" theory of antitrust injury would fail on the merits. The FLPs premise their claim of "traditional" antitrust injury on their supposed status as both "competitors" and "consumers" of Defendants in the aluminum market. *See* FLP Br. at 30, 32, 34, 37, 43. Neither contention has merit.

---

[19] The FLPs cannot blame the District Court for their decision not to pursue a theory of antitrust injury based on a direct restraint of the aluminum market. The FLPs state that the District Court in *Aluminum I* invited them to ride multiple "horses" (*i.e.*, plead multiple markets) and then "abandon[ed] . . . its multiple-'horses' approach" in dismissing the FLPs' action. FLP Br. at 6, 33. But none of the District Court's rulings prevented the FLPs from pursuing whatever theory of antitrust injury they wished. The FLPs cannot "shift[] responsibility" to the District Court for their own strategic choice not to "focus on alternative arguments." *In re Enron Corp. Sec. Litig.*, 610 F. Supp. 2d 600, 654-55 (S.D. Tex. 2009).

### a.  The FLPs Did Not Suffer Antitrust Injury as Defendants' "Competitors."

The FLPs' principal argument is that they suffered traditional antitrust injury because Metro "offered incentive payments to aluminum producers" that "competed with Plaintiffs" for available aluminum.  *Id*. at 18.  According to the FLPs, this Court "had no occasion" in *Aluminum III* "to analyze whether [Metro] competed against Plaintiffs for producers' aluminum in the physical market through [its] incentives."  *Id*. at 48.

In fact, *Aluminum III* fully considered whether aluminum purchasers suffer antitrust injury as a result of warehouse incentive payments.  Like the FLPs, the Consumers argued that "non-LME buyers [of aluminum] must compete with the incentive payments Defendants pay to divert aluminum to their LME warehouses." SJA737.  This Court nevertheless held that "incentive payments" offered by warehouses to "attract more aluminum" into storage involve "conduct [that] took place (if at all) in the LME-warehouse storage market."  *Aluminum III*, 833 F.3d at 162.  The District Court thus correctly rejected the FLPs' argument that warehouses "compete" in the aluminum market by offering storage incentives, SA82, holding that this argument "stretches the definition of the relevant market to an insupportable level of generality."  SA82 n.9.

The FLPs' claim of antitrust injury based on competition from incentive payments also fails because the FLPs are complaining about an increase in

competition, not a restraint of competition. The FLPs essentially are arguing that they could have bought aluminum at lower prices if Metro had stopped competing through incentive payments.[20] Under settled law, however, antitrust injury must flow from a *reduction* in competition, not from *increased* competition. *See Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). "[I]t is axiomatic that the antitrust laws do not protect . . . against competition." *Port Dock & Stone Corp.* v. *Oldcastle Ne., Inc.*, 507 F.3d 117, 122 (2d Cir. 2007).

Lastly, even if the FLPs were injured by Metro's incentives, the FLPs fail to explain how those payments supposedly were tied to the antitrust conspiracy alleged in their complaint. There are no well-pled allegations that any Defendant aside from Metro paid storage incentives (or conspired with Metro to raise its incentives) in North America, the relevant geographic market. *See* JA1565-67 (¶¶ 203-09). The FLPs cannot claim to have suffered antitrust injury from a conspiracy in violation of Section 1 based solely on allegations of Metro's

---

[20] Metro did not actually purchase any aluminum; instead, it competed with other warehouses for storage business by offering "incentive payments" as an inducement for aluminum owners to store surplus aluminum in Metro's Detroit warehouses. JA1500 (¶ 9(D)).

unilateral conduct in the warehouse market. *See Am. Needle, Inc.* v. *Nat'l Football League*, 560 U.S. 183, 190 (2010) ("Section 1 applies only to concerted action.").[21]

The FLPs also contend that "Goldman Sachs, JPMorgan, and Glencore competed directly" with them by "purchasing billions of dollars' worth of aluminum . . . directly from producers." FLP Br. at 5; *see also id*. at 21. But the FLPs nowhere allege that the trader Defendants' aluminum purchases were either anticompetitive or conspiratorial. In addition, the FLPs cannot claim antitrust injury based on allegations that they had to compete with other purchasers for aluminum. Even assuming that they suffered "injury from [such] competition, . . . the antitrust laws do not protect a competitor against competition." *Port Dock & Stone*, 507 F.3d at 122; *see also*, *e.g.*, *Atl. Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328, 337-38 (1990) (complaints about price competition are "not *antitrust* injury"); *Cargill, Inc.* v. *Monfort of Colo., Inc.*, 479 U.S. 104, 116 (1986) (rejecting argument that "antitrust laws protect competitors from . . . price competition").

---

[21] As the District Court correctly held, JA1461, the FLPs cannot plead a conspiracy in violation of Section 1 by contending that Metro conspired with other affiliated Goldman entities. *See Copperweld Corp.* v. *Independence Tube Corp.*, 467 U.S. 752, 771-74 (1984) (parent and subsidiaries are single entity for purposes of Section 1).

### b. The FLPs Did Not Suffer Antitrust Injury as Defendants' "Consumers."

The FLPs also argue that they suffered antitrust injury because they were "Defendants' . . . consumers in the physical-aluminum market." FLP Br. at 32; *see also id*. at 30, 34, 37, 43. In support, they assert that "Defendants sold [aluminum] to Plaintiffs and the class." *Id*. at 8; *see also id*. at 4 ("[Defendants] sold to Plaintiffs and the class"); *id*. at 20 ("[Defendants] sold metal to Plaintiffs and the class"). That assertion fails to establish antitrust injury under *Aluminum III*.

As a threshold matter, the FLPs' assertion that Defendants sold aluminum to members of the proposed class is inaccurate. Although the FLPs initially alleged a putative class that included persons who "purchased aluminum directly from a Defendant," JA1631 (¶ 426), they later abandoned that portion of the class in seeking class certification, limiting their proposed class to persons who "made a first level purchase of a primary aluminum product" from a smelter. SJA782.

More broadly, the FLPs cannot establish antitrust injury simply by arguing that they participated as consumers in the same aluminum market in which the trader Defendants also participated. *See* FLP Br. at 7, 31. Under *Aluminum III*, participation in the same market in which a defendant participates—but that is not directly restrained by the defendant's anticompetitive conduct—is insufficient to establish antitrust injury. As this Court made clear, "the putative plaintiff must be a participant in the very market that is *directly restrained*" by a defendant.

-59-

*Aluminum III*, 833 F.3d at 161 (emphasis added). The FLPs cannot make that showing here because they rely on the same four types of conduct that the Commercials and Consumers challenged. *See* FLP Br. at 15-17. As the District Court stated, the FLPs "confuse the market where some competitive effects were felt (the buying and selling of physical aluminum) with what" this Court "focused on, the locus of the anticompetitive conduct and where the effects of any restraint were experienced most directly." SA83.

The FLPs also mistakenly contend that they suffered antitrust injury because Defendants necessarily had to injure them in the aluminum market to extract anticompetitive profits from the alleged conspiracy. *See* FLP Br. at 39-40. But the FLPs themselves allege that the conspiracy enabled Defendants to profit in the *warehouse* market by earning higher warehouse rents. *See* JA1604 (¶ 330); JA1697-99 (¶¶ 598-601). Indeed, the TAC expressly asserts that "warehouses benefit from the existence of queues in the system by being able to charge higher rents." JA1699 (¶ 601). According to the FLPs, the prospect of higher rents alone provided a sufficient reason for the alleged anticompetitive conduct. *See* JA1604 (¶ 330) ("[T]his anticompetitive behavior also significantly increased Metro's rental revenues . . . ."); FLP Br. at 3 ("Defendants' coordinated restraints" allowed them to make "more money . . . from warehouse rent"); *id.* at 13 (Defendants' conduct "enabled warehouses to earn increased rental revenues").

Even as to the aluminum market, the FLPs' own submissions indicate that Defendants did not need to raise all-in aluminum prices—and thus injure the FLPs—to profit from the alleged conspiracy. According to the FLPs, Defendants typically hedge their exposure to changes in the largest component of all-in aluminum prices—the LME price—by selling futures contracts. SJA459-60. Because of these hedges, Defendants allegedly "stand[] to benefit from a rise in the Midwest Premium *but [are] indifferent to changes in the LME component of the aluminum price*." SJA459-60 (emphasis added).[22] Thus, under the FLPs' own theory, Defendants would not have cared if warehouse delivery queues *raised* the Midwest Premium only by *depressing* LME prices for aluminum relative to all-in aluminum prices, and thus had no effect on all-in prices. That is exactly how the LME explained that warehouse queues affect the Midwest Premium. *See supra* at 16-17. As a result, any alleged injury to the FLPs was at most "collateral damage" rather than the necessary and intended result of the alleged conspiracy to lengthen warehouse queues. *See Aluminum III*, 833 F.3d at 163.

The FLPs' argument that they were the intended victims of Defendants' conduct also does not distinguish them from the Commercials and Consumers. For instance, the Commercials argued that "Defendants sought to stockpile aluminum"

---

[22] *See also* IP Br. at 10-11 (traders are "normally hedging the base price" and thus "*make their money through the premium*"); JA3184 (¶¶ 139-40).

in warehouses in order to "drive up prices in the physical aluminum market, allowing them to realize a greater profit from sales of their aluminum holdings." SJA652. This Court nevertheless held that the Commercials and Consumers did not suffer antitrust injury because they "do not and cannot allege that they participated" in the directly restrained warehouse market. *Aluminum III*, 833 F.3d at 162. Despite their claim that Defendants "*intended* to corrupt the market for primary aluminum," this Court concluded that any "[i]njury to Consumers and Commercials remains collateral damage." *Id*. at 162, 163 (emphasis added).

Lastly, the FLPs' reliance on *Gelboim* v. *Bank of America Corp.*, 823 F.3d 759 (2d Cir. 2016), is misplaced. FLP Br. at 50. In that case, which involved a claim of horizontal price-fixing, this Court simply recognized that consumers that purchase a price-fixed product directly from a price-fixer suffer antitrust injury. *See* 823 F.3d at 772-75. *Gelboim* did not have occasion to address the claims at issue in *Aluminum III* and here: consumers' claims that they paid prices that allegedly were *affected* by defendants' conduct in another market. *Aluminum III* holds that such consumers do not suffer antitrust injury.[23]

---

[23] Nor can the FLPs find support (FLP Br. at 51) in *United States* v. *Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940), a criminal prosecution that did not present the question of whether a private plaintiff suffered antitrust injury under Section 4 of the Clayton Act. *Socony-Vacuum* is also distinguishable because it involved actual price-fixing and the anticompetitive conduct occurred in the same market in which prices were fixed—the gasoline spot market. 310 U.S. at 165-70.

####    4.    The District Court Did Not Disregard the "Factual Record" Submitted by the FLPs.

The FLPs assert that the "factual record" they submitted in opposition to Defendants' motion for judgment on the pleadings filled any gaps in the TAC. FLP Br. at 59.  Contrary to the FLPs' assertion, however, the District Court did not "disregard[] the factual record."  *Id*. at 60.  Rather, the District Court converted Defendants' motion "to one pursuant to Rule 56" and provided the parties "an opportunity to make additional factual submissions."  SA81 n.5.  The court then devoted an entire section of its *Aluminum IV* opinion to the factual record.  *See* SA81-85.  After reviewing the FLPs' evidence, the District Court correctly concluded that their claim of "direct antitrust standing . . . is ultimately not persuasive."  SA82.

The District Court properly held that the FLPs' evidence could not overcome the fact that their legal theory "fail[s] substantively."  SA83.  As the court explained, "[w]hile the FLPs . . . submitted a number of documents purportedly showing that defendants owned and traded in aluminum, there is no allegation or evidence in the record that defendants engaged in any anticompetitive conduct outside of the aluminum warehouse services market."  SA83-84 (citations omitted).  Because Defendants' "scheme was allegedly effected through anticompetitive acts in warehouse storage services," SA84, that was the directly restrained market under *Aluminum III*.  Like the Commercials and Consumers, the

-63-

FLPs "do not and cannot allege that they participated in that market," and thus "they did not (and could not) suffer antitrust injury." *Aluminum III*, 833 F.3d at 154, 162.

### D. The District Court Properly Denied the FLPs' Post-Judgment Request for Leave to Amend.

After judgment was entered, the FLPs filed a Rule 59(e) motion to alter or amend the judgment and simultaneously moved for leave to file a proposed *sixth* amended complaint. The District Court did not abuse its discretion in denying that motion. *See Green* v. *Mattingly*, 585 F.3d 97, 104 (2d Cir. 2009) (denial of leave to amend reviewed for abuse of discretion).

The FLPs argue that the District Court's decision should be reviewed *de novo* because "futility" was the sole basis for the court's ruling. *See* FLP Br. at 68-69 & n.18. Contrary to the FLPs' assertion, the District Court offered three independent grounds for its decision:

> [i] The Second Circuit's decision in *Aluminum III* applied existing law—it did not constitute an intervening change. [ii] This Court allowed ample opportunities to state a claim—indeed, the briefing on the pleadings spanned over two years. [iii] In all events, the amendments would be futile for substantially reasons already stated . . . .

SA107. Each of these grounds was a sufficient basis to deny the FLPs' motion.

*First*, the District Court correctly denied the FLPs' post-judgment motion on the ground that *Aluminum III* was not an "intervening change" in the law. "As a

procedural matter, '[a] party seeking to file an amended complaint postjudgment must first have the judgment vacated or set aside pursuant to [Rules] 59(e) or 60(b).'" *Williams* v. *Citigroup Inc.*, 659 F.3d 208, 213 (2d Cir. 2011) (citation omitted); *see also Smith* v. *Hogan*, 794 F.3d 249, 256 (2d Cir. 2015) ("Because [plaintiff] did not succeed in having the judgment vacated, he was not entitled to replead at this stage of the case."). "A court may grant a Rule 59(e) motion only if the movant satisfies the heavy burden of demonstrating an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Hollander* v. *Members of Bd. of Regents of Univ. of N.Y.*, 524 F. App'x 727, 729 (2d Cir. 2013) (internal quotation marks omitted). The FLPs do not challenge the District Court's holding that there was no intervening change of controlling law or otherwise attempt to satisfy the heavy burden for vacating a judgment.

*Second*, the District Court properly held that the FLPs' delay supported denial of leave to amend. In denying the FLPs' post-judgment motion, the court emphasized that the FLPs already had been afforded "ample opportunities to state a claim—indeed, the briefing on the pleadings spanned over two years." SA107. That ruling was within the court's discretion and reinforced by the FLPs' inexplicable decision to wait until *after* entry of judgment to seek leave to amend. *See* 11 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2810.1

-65-

(3d ed. 2012) ("[R]econsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly . . . . In practice, because of the narrow purposes for which they are intended, Rule 59(e) motions typically are denied").[24]

*Third*, the District Court correctly found that "the amendment would be futile." SA107. The principal change in the FLPs' proposed amended complaint was to assert in conclusory fashion that "[t]he Physical Aluminum and Warehouse Markets do not operate as distinct or separate markets." SJA1054 (¶ 143). According to the FLPs, this "one-market allegation" cures any antitrust-injury problem because it means that they and Defendants "were participants in the same over-arching market." FLP Br. at 71. But the FLPs continue to rely (*id*. at 72-73) on the exact same allegations of anticompetitive conduct, which this Court held in *Aluminum III* "took place (if at all) in the LME-warehouse storage market." 833 F.3d at 162. This Court did not suggest that the Commercials and Consumers could plead around that ruling simply by deleting any explicit allegation of a separate warehouse market from their complaints. To the contrary, this Court

---

[24] If the FLPs were permitted to alter their theory of the case at this stage— after the close of fact discovery and even after final judgment—it would open the floodgates to re-litigation of actions after dispositive rulings. "Such a practice would dramatically undermine the ordinary rules governing the finality of judicial decisions, and should not be sanctioned in the absence of compelling circumstances." *James* v. *Watt*, 716 F.2d 71, 78 (1st Cir. 1983) (Breyer, J.).

stated that those plaintiffs "failed to allege (*and could not allege*) antitrust injury." *Id*. at 163 (emphasis added).

## II. The Dismissal of the IPs' Actions Should Be Affirmed.

In an attempt to distinguish themselves from the FLPs, the IPs contend that they have alleged that Defendants "conspired to fix physical aluminum prices." IP Br. at 2. They then assert "that as purchasers of a price-fixed product they ha[ve] suffered antitrust injury." *Id*. But the IPs have not pled a "horizontal price-fixing conspiracy." *Id*. at 4. Like the FLPs, the IPs instead allege that Defendants engaged in conduct in one market—the warehouse market—that supposedly *affected* prices in another market—the aluminum market. Once the IPs' claims are properly characterized, they cannot avoid dismissal under *Aluminum III* because the IPs never participated in the directly restrained warehouse market.[25]

The IPs also appeal two earlier decisions: the District Court's (i) ruling that they failed to state a claim against three parent or affiliated corporations, and (ii) denial of the IPs' motion for leave to amend their complaints made near the end

---

[25] The IPs note that the District Court initially "*sua sponte*" dismissed their cases after dismissing the FLPs' action. IP Br. at 22. That dismissal was not surprising given how similar the FLPs and IPs' complaints are. *See* SA95-100. At their request, however, the District Court permitted the IPs to submit two briefs and present oral argument on antitrust injury, SA93, thus giving the IPs ample opportunity to be heard. *See Thomas* v. *Scully*, 943 F.2d 259, 260 (2d Cir. 1991) ("district court has the power to dismiss a complaint *sua sponte* for failure to state" a claim so long as plaintiff is provided "an opportunity to be heard").

-67-

of fact discovery.  This Court need not review those decisions because all of the IPs' claims fail as a matter of law for lack of antitrust injury.  Should it reach those issues, however, the Court should affirm the District Court's rulings.

### A. The IPs Have Not Alleged Horizontal Price Fixing.

The IPs construct their antitrust-injury argument on a false premise.  They frame the issue presented as follows:

> Whether the District Court erred in ruling that IPs, who purchased physical aluminum, did not suffer antitrust injury under Section 1 of the Sherman Act, 15 U.S.C. § 1, as a result of *Defendants-Appellees' horizontal conspiracy to fix the price of aluminum*.

IP Br. at 3 (emphasis added).  Despite the IPs' repeated assertion they have asserted a price-fixing claim, their complaints allege something different:  that Defendants' alleged conspiracy to lengthen queues in the warehouse market had the *effect* of increasing a component of prices in the aluminum market.

Citing a single sentence from their complaints, the IPs argue that "[f]rom the very beginning, [they] alleged a physical aluminum price-fixing conspiracy."  *Id*. at 31 (citing JA1752 (¶ 2); SJA1192 (¶ 2)).  But that sentence does not allege price fixing.  It instead asserts that Defendants conspired to "manipulate" the price of aluminum by engaging in anticompetitive conduct "in key [LME]-certified warehouse locations controlled by them."  JA1752 (¶ 2); SJA1192 (¶ 2).  As a result, the District Court expressly rejected the notion that the IPs had alleged price fixing:  "Plaintiffs do not allege that defendants have fixed a particular spot price

-68-

for aluminum—but rather that they have taken a variety of actions that have caused the Midwest Premium to increase." JA1433; *see also* JA1437 ("[T]his conspiracy was not a traditional 'price fix'—no price was fixed.").[26]

As the District Court explained, the IPs do not allege that Defendants agreed "to fix the price of aluminum at a supra-competitive level or to fix the Midwest Premium at a particular level." JA1440. Instead, Defendants allegedly engaged in conduct that created lengthy warehouse queues and that indirectly affected the Midwest Premium. *See* IP Br. at 16. The court also recognized that much of the challenged conduct—such as offering incentives for aluminum deposits—was "vertical" in nature and at least arguably procompetitive.[27] *See* JA789. The IPs

---

[26] In arguing that they have alleged that Defendants fixed aluminum prices, the IPs rely on an incomplete quotation from *Aluminum II*. IP Br. at 35 (quoting SA140). By omitting the language italicized below, the IPs obscure that the court was discussing a restraint in the warehouse market: "the co-conspirators worked with each other to restrain a very specific piece of the aluminum supply *comprising only a small portion of the total amount of available physical aluminum: aluminum traded by way of LME warrants.*" SA140 (emphasis added).

[27] Incentive payments plainly involve vertical conduct: a warehouse operator essentially offers its customers an upfront rent rebate as an inducement to store their aluminum at its warehouse. Such conduct is a procompetitive form of price discounting. *See Virgin Atl. Airways Ltd.* v. *British Airways PLC*, 257 F.3d 256, 269 (2d Cir. 2001). Similarly, warrant cancellations involve either vertical or unilateral conduct: an aluminum owner cancels its warrants and directs a warehouse operator to load out the corresponding aluminum. That conduct likewise is facially procompetitive. Plaintiffs assert that too much aluminum was stored in Metro's Detroit warehouses, but aluminum cannot leave those warehouses unless and until the corresponding warrants are cancelled.

never explain why such conduct supposedly falls within the narrow category of "manifestly anticompetitive" horizontal restraints subject to the *per se* rule. *Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*, 551 U.S. 877, 886 (2007).

A review of the IPs' complaints confirms that they have not alleged horizontal price fixing. Rather, the complaints describe conduct in the warehouse market that supposedly affected the aluminum market through a multi-step chain of causation. *See* JA1753-58 (¶¶ 3-17); JA1793-1829 (¶¶ 160-260); SJA1232-73 (¶¶ 146-261). For example, the IPs expressly allege that "Defendants' conduct impaired competition among suppliers of warehouse services and this, in turn, had a predictable and foreseeable *effect* on the market for aluminum for physical delivery." JA1849 (¶ 314) (emphasis added); *see also* SJA1293 (¶ 319). The IPs thus argued below that the central question in these cases "is whether Defendants' anticompetitive conduct in the LME warehousing market caused Plaintiffs' injury in the physical aluminum market." SJA18. The IPs' claim that an alleged restraint of trade in one market affected prices in another market is not a price-fixing claim.

None of the cases cited by the IPs supports their assertion that they have alleged "horizontal price-fixing." *See* IP Br. at 32-34. For instance, *United States* v. *Apple, Inc.*, 791 F.3d 290, 326-28 (2d Cir. 2015), involved a horizontal agreement among publishers to raise prices in the e-book market through concerted action in that same market. Similarly, *FTC* v. *Superior Court Trial Lawyers Ass'n*,

-70-

493 U.S. 411, 422-23 (1990), involved a collective agreement among Criminal Justice Act lawyers not to serve their only customer in an effort to obtain higher fees. Finally, *Gelboim* involved an alleged conspiracy among a group of competitors to fix a component of the prices they charged customers—the LIBOR interest rate—by making false submissions to the LIBOR panel. 823 F.3d at 771. Here, there are no comparable allegations that Defendants colluded to "fix" the Midwest Premium by, for example, making false submissions to Platts, the firm that reports the Midwest Premium. Instead, Defendants allegedly conspired to "creat[e] and exacerbat[e] lengthy load-out queues at key LME warehouses," which supposedly had an effect on the Midwest Premium. IP Br. at 16. This Court already has held that such an effect is not a direct restraint of the aluminum market. *Aluminum III*, 833 F.3d at 162.

### B. The IPs Did Not Suffer Antitrust Injury Under *Aluminum III*.

In arguing that they suffered antitrust injury, the IPs urge this Court to apply "the general test for antitrust injury" in *Gatt*. IP Br. at 30. But this Court need not resort to *Gatt*'s "general test" because *Aluminum III* is directly on point. Far from ignoring *Gatt*, this Court cited *Gatt* three separate times in *Aluminum III*. *See* 833 F.3d at 157-58. The IPs attempt to distinguish *Aluminum III* by contending that it applies only to claims of antitrust injury under *McCready*, and not to claims of

what they call "classic" antitrust injury. IP Br. at 3.[28] By its terms, however, the *Aluminum III* test applies to antitrust injury in all of its forms, not just to "inextricably intertwined" antitrust injury under *McCready*. 833 F.3d at 161; *see supra* at 37-39.

The IPs are indistinguishable from the Commercials and Consumers for purposes of the *Aluminum III* test for antitrust injury. Like those other plaintiffs, the IPs allege distinct markets for aluminum and for "LME-certified warehouse services for aluminum." JA1788-89 (¶ 144); SJA1227 (¶ 130). The IPs also contend that Defendants engaged in the same four types of anticompetitive conduct in the warehouse market. IP Br. at 16; JA1793-1829 (¶¶ 160-260); SJA1232-83 (¶¶ 146-287).[29] In fact, in seeking leave to file their JAC, the IPs asserted: "here, the anticompetitive conduct is in the warehouse services market relating to aluminum." SJA23. The IPs thus argued that "[t]he question is whether Defendants' anticompetitive conduct in the LME warehousing market caused Plaintiffs' injury in the physical aluminum market." SJA18.

---

[28] Contrary to the IPs' assertion that they "did not assert a *McCready* 'inextricably intertwined' antitrust injury," IP Br. at 3, their memorandum in support of their JAC cited *McCready* "*passim.*" SJA3.

[29] Although the IPs also point to the "queue at Pacorini's Vlissingen warehouse" in the Netherlands, IP Br. at 17, that does not distinguish them from those the Commercials, which made the same allegations. JA404-05 (¶¶ 142-44).

The IPs also do *not* allege that they ever participated in the directly restrained warehouse market. They instead advance the same theory of injury that the Commercials and Consumers asserted in *Aluminum III*—that Defendants' alleged conduct in the warehouse market affected the prices they paid in the aluminum market. *See* JA1793-1829 (¶¶ 160-260); SJA1232-83 (¶¶ 146-287); SJA18. That theory fails to establish antitrust injury under *Aluminum III*. As the District Court correctly stated, "being affected by the anticompetitive conduct is simply not enough," and "that is all that plaintiffs here are able to show." SA102; *see also Daniel* v. *Am. Bd. of Emergency Med.*, 428 F.3d 408, 438 (2d Cir. 2005) ("The fact that private plaintiffs have been injured by acts that violate the antitrust laws is not enough to confer standing to sue.").

### C. The IPs' Attempts to Distinguish *Aluminum III* Do Not Withstand Scrutiny.

Like the FLPs, the IPs try to distinguish themselves from the Commercials and Consumers by contending that those plaintiffs "disavowed" participation in any of Defendants' markets. IP Br. at 36. The IPs are mistaken. As this Court noted, the Commercials and Consumers—like the IPs—"premise[d] their claim to antitrust injury . . . on their purchases of aluminum and aluminum products *on the physical aluminum market*." *Aluminum III*, 833 F.3d at 162 (emphasis added). The District Court thus properly concluded that the IPs "are similarly situated to the indirect purchasers examined by the Second Circuit." SA101.

-73-

Nor are the IPs correct that the *Aluminum III* plaintiffs claimed antitrust injury only under *McCready*. In addition to relying on *McCready*, the Commercials and Consumers asserted that they had "alleged a classic supply restraint, giving rise to traditional antitrust injury," because "Defendants' practices artificially limited the supply of aluminum available to the market by trapping large quantities of it in LME warehouses." SJA734; *see also supra* at 21. Despite their contention that Defendants "intended to corrupt the market for primary aluminum," this Court held that the Commercials and Consumers did not suffer antitrust injury because they did not participate in the directly restrained warehouse market. *Aluminum III*, 833 F.3d at 162. The same is true of the IPs.

The IPs nevertheless insist that they suffered antitrust injury because "they participated as buyers in the physical aluminum market" and the trader Defendants also participated in that market. IP Br. at 30. As the District Court correctly recognized, however, *Aluminum III* made clear that, "no matter the theory of antitrust injury, a plaintiff must participate in 'the very market that is directly restrained.'" SA101 (quoting *Aluminum III*, 833 F.3d at 161). "That is not the same as participating in a market in which a defendant also participates but does not restrain." SA101. Although the IPs allege that the trader Defendants *participated* in the aluminum market, they do not allege that Defendants directly *restrained* competition in that market. Instead, as this Court held, all of the

-74-

collusive conduct alleged by the IPs—cancellations of warehouse warrants, warehouse incentive payments, slow warehouse load-outs, and transfers of aluminum among warehouses—occurred in the warehouse market. *Aluminum III*, 833 F.3d at 162. Allegations that Defendants engaged in *non-collusive* conduct in the aluminum market cannot transform that market into one that Defendants directly restrained.

The IPs' four remaining criticisms of the District Court's decision are equally unfounded. First, the IPs assert that the District Court "did not address IPs' argument that they suffered classic antitrust injury in the market for physical aluminum." IP Br. at 5. In fact, the District Court recognized that *Aluminum III* requires dismissal of the IPs' claims, "regardless of whether [they] invoke[] a 'traditional' or '*McCready*' theory of antitrust injury," because "'the putative plaintiff must be a participant in the very market that is directly restrained.'" SA104 (quoting *Aluminum III*, 833 F.3d at 161).

Second, the IPs argue that the District Court "erroneously concluded that . . . the LME warehousing market was the 'locus' of the anticompetitive conduct." IP Br. at 26. But the IPs previously admitted that "the anticompetitive conduct is in the warehouse services market," SJA23, and this Court already held that all of the conduct at issue here "took place (if at all) in the LME-warehouse storage market."

*Aluminum III*, 833 F.3d at 162. The District Court simply applied that holding to the same allegations of anticompetitive conduct in these cases. SA102-03.

Third, the IPs argue that the test for antitrust injury should be whether the plaintiff participated in the "ultimate target market" as determined by the defendant's subjective intent. IP Br. at 40. Under *Aluminum III*, however, the test for antitrust injury does not turn on the defendant's subjective intent, but rather on whether the plaintiff participated "in the very market that is directly restrained." 833 F.3d at 161; *see also*, *e.g.*, *McCready*, 457 U.S. at 479 ("The availability of the § 4 remedy to some person who claims its benefit is not a question of the specific intent of the conspirators."); *Laborers Local 17 Health & Benefit Fund* v. *Philip Morris, Inc.*, 191 F.3d 229, 242 (2d Cir. 1999) (holding under RICO provision based on Section 4 of Clayton Act that "an allegation of specific intent does not overcome the requirement that there must be a direct injury"). Indeed, *Aluminum III* held that the Commercials and Consumers lacked antitrust injury even though they, too, asserted that Defendants "intended to corrupt the market for primary aluminum." 833 F.3d at 162; *see also* SJA652-53; SJA734; SJA748-49.

Finally, the IPs contend that the District Court ignored *McCready*'s discussion of the "hypothetical conspiracy among psychiatrists directed against psychologists, . . . where the conspirators boycotted a bank until that bank ceased making loans to psychologists." IP Br. at 41 (citing *McCready*, 457 U.S. at 484

-76-

n.21). According to the IPs, the existence of a *McCready* plaintiff in that hypothetical (the bank) "does not eliminate the standing" of potential plaintiffs in the psychotherapy market. *Id*. at 42. But the claims here are meaningfully different. In the *McCready* hypothetical, there was no suggestion that the psychiatrists stood to profit from injuring the single boycotted bank, except insofar as that conduct restrained the psychotherapy market. Here, by contrast, the IPs allege that Defendants directly restrained the warehouse market and that they profited from that restraint through higher warehouse rents. *See* JA1788-89 (¶ 144); JA1807-29 (¶¶ 197-260); JA1839-41 (¶¶ 285-88); JA1848-49 (¶ 314). The existence here of a separate, directly restrained market in which Defendants allegedly profited as a result of their anticompetitive conduct distinguishes the IPs' claims from those of the psychologists in the *McCready* hypothetical.[30]

### D. The Three Parent or Affiliated Companies Were Properly Dismissed.

The IPs contend that the District Court earlier in the litigation erroneously dismissed their claims against three parent or affiliated corporations—The Goldman Sachs Group, Inc. ("GS Group"), JPMorgan Chase & Co. ("JPMCC")

---

[30] Similarly, the plaintiff trade-show operator in *Crimpers Promotions Inc.* v. *Home Box Office, Inc.*, 724 F.2d 290 (2d Cir. 1983), did not allege that the defendants directly restrained (and profited in) a separate market for television trade shows. To the contrary, the plaintiff alleged that defendants injured its trade show as part of an effort to "unlawfully monopolize[] the market for programming" to the cable pay-television industry. *Id*. at 291.

and Pacorini Metals AG ("PMAG"). *See* IP Br. at 23, 26-27, 48-53. The District Court dismissed those Defendants because the IPs' complaint simply "lump[s] these defendants together within a grouping with several affiliated companies." SA42. Because the IPs do not allege "that any of these entities failed to observe corporate formalities," the District Court held that "claims against them are plausible only if there are factual allegations that specifically pertain to them . . . that are sufficient to state a claim." SA44. The District Court concluded that the JAC fails to plead "any specific facts that suggest any participation by any one of [the three corporations] in the allegedly unlawful conduct." SA44.

Citing *Copperweld*, the IPs argue that the District Court erred in dismissing the claims asserted against these three corporations because they "operate through their subsidiaries." IP Br. at 50. But "[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States* v. *Bestfoods*, 524 U.S. 51, 61 (1998). *Copperweld* does not alter that "deeply ingrained" legal principle.[31]

---

[31] *Copperweld* addressed "whether a parent corporation and its wholly owned subsidiary are legally capable of conspiring with each other." 467 U.S. at 755. "[I]t does not follow from *Copperweld* that subsidiary entities are automatically liable under § 1 for any agreements to which the parent is a party," or vice versa. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 341 (3d Cir. 2010). "As a matter of well-settled common law, a subsidiary is a distinct legal entity and is not liable for the actions of its parent or sister corporations simply by dint of the corporate relationship." *Id.*

-78-

GS Group, JPMCC and PMAG are not alleged to have "engaged in the activities" challenged by the IPs. *Cohen* v. *Stevanovich*, 722 F. Supp. 2d 416, 421 n.1 (S.D.N.Y. 2010). Because the IPs "allege no independent basis for liability against them, those companies do not belong as named parties in this action." *Id.*; *see also SD3, LLC* v. *Black & Decker (U.S.) Inc.*, 801 F.3d 412, 423 (4th Cir. 2015).

The IPs argue that "once a conspiracy is shown, only 'slight evidence' is needed to link another defendant with it." IP Br. at 27. But this Court overruled the "slight evidence" rule, at least in criminal conspiracy cases. *United States* v. *Huezo*, 546 F.3d 174, 180 n.2 (2d Cir. 2008) (use of "slight evidence" rule "should be discontinued").[32] Even if the rule still were to apply in civil antitrust cases, it would have no bearing on whether a parent corporation can be held liable for the acts of its subsidiaries based solely on its ownership of them. As the District Court recognized, "[i]n the absence of allegations that corporate formalities have been ignored, courts appropriately and routinely adhere to legal separateness." SA42.

---

[32] *See also Huezo*, 546 F.3d at 184 (Newman, J., concurring) (rule is "incorrect, entered federal jurisprudence improvidently, ha[s] been routinely repeated without consideration of [its] infirmity, and should be discarded"); *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192, at *13 n.13 (N.D. Cal. Jan. 21, 2014) ("[T]he proffered 'slight connection' or 'slight evidence' rule has been disapproved as a standard for determining whether a defendant has joined a conspiracy . . . .").

Nor do the IPs identify any paragraphs of the JAC that plausibly allege that GS Group, JPMCC or PMAG performed a single act in furtherance of the purported conspiracy. The IPs cite only two paragraphs that relate specifically to GS Group or JPMCC. IP Br. at 51-52 (citing SJA50 (¶ 50); SJA52 (¶ 57)). Those paragraphs allege only that those Defendants are "international financial compan[ies]." SJA50 (¶ 50); SJA52 (¶ 57). But these "holding companies" (SA40) are not alleged to have any operations themselves; rather, they are alleged to act through their subsidiaries. SA42-43. "Antitrust law doesn't recognize guilt by mere association, imputing corporate liability to any affiliate company unlucky enough to be a bystander to [a related] company's alleged misdeeds." *SD3*, 801 F.3d at 423. Other paragraphs cited by the IPs refer collectively to "Defendants," "Goldman," "JPMorgan" or "JPM," not to GS Group or JPMCC. IP Br. at 51-52 (citing SJA42-43 (¶ 17); SJA84 (¶ 176); SJA91 (¶ 194); SJA126-27 (¶¶ 290-91)). As the District Court properly held, the IPs cannot satisfy their pleading burden by employing "a naming convention that purports to capture all of the affiliated companies together" with such generic terms. SA42; *see SD3*, 801 F.3d at 422 ("A plaintiff in a § 1 case cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group.").

The IPs' allegations against PMAG are also deficient. The IPs allege that PMAG "is an entity organized under the laws of Switzerland and with its principal

place of business in Zug, Switzerland." SJA57 (¶ 79). Although the JAC asserts that PMAG "is a leading provider of LME-certified warehouses throughout the world," it also alleges that PMAG operates in the United States "through its wholly owned subsidiary, Pacorini USA, and in the Netherlands, . . . through . . . its wholly owned subsidiary, Pacorini Vlissingen BV." SJA57 (¶ 79). The IPs cannot state a claim against PMAG based solely on the alleged actions of its affiliates.[33]

In sum, "[t]he fact that two separate legal entities may have a corporate affiliation does not alter [the] pleading requirement to separately identify each defendant's involvement in the conspiracy." *SD3*, 801 F.3d at 423 (internal quotation marks omitted). Because the IPs' JAC fails to plead any facts that connect GS Group, JPMCC or PMAG to the alleged conspiracy, the District Court properly dismissed the IPs' claims against those corporate entities.

### E. The Denial of Leave to Amend Was Not an Abuse of Discretion.

Near the end of fact discovery, the IPs belatedly sought leave to amend their complaints, even though the scheduling order made no provision for further amendments. Applying Rule 16(b)'s standard for modifying a scheduling order, the District Court "conclude[d] that plaintiffs . . . failed to establish sufficient good cause to justify allowing these pleadings at this late juncture." SA47. As the court

---

[33] The IPs further state that "PMAG manager Peter Waszkis was a LME Warehousing Committee member." IP Br. at 53. But the JAC does not plead any facts that connect either Mr. Waszkis or PMAG to the purported conspiracy.

explained, "[n]ot only would allowing the amendments seriously prejudice defendants and cause substantial delays to the existing schedule, but plaintiffs, moreover, did not exercise reasonable diligence in putting these motions before the Court in a timely manner."  SA47.

The IPs argue that the District Court "applied the wrong standard" in denying their motion.  IP Br. at 27.  According to the IPs, the court should have "allow[ed] amendment under Rule 15" rather than applying "Rule 16(b)'s requirement of 'good cause.'"  *Id*.  The IPs further contend that the District Court abused its discretion in denying leave to amend.  Those arguments are meritless.

### 1. Rule 16(b)'s Good Cause Standard Applies.

"Where a scheduling order has been entered, the lenient standard under Rule 15(a) . . . must be balanced against the requirement under Rule 16(b) that the Court's scheduling order shall not be modified except upon a showing of good cause."  *Grochowski* v. *Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 16(b)(4).  "By limiting the time for amendments, [Rule 16(b)] is designed to offer a measure of certainty in pretrial proceedings, ensuring that 'at some point both the parties and the pleadings will be fixed.'"  *Parker* v. *Columbia Pictures Indus.*, 204 F.3d 326, 339-40 (2d Cir. 2000) (quoting Fed. R. Civ. P. 16 advisory committee's note).

The District Court correctly held that Rule 16(b)'s "good cause" standard applies to the IPs' request to amend because it would have required a modification of the existing schedule. While neither of the scheduling orders entered in this case included an explicit deadline for amending the pleadings, that was only because the time for amending the pleadings already had passed by the time those orders were entered. *See* SA49-54. As the District Court observed, in light of the prior motion practice, "*[n]o party sought*—and the scheduling order [first entered on April 3, 2015] did not explicitly state—a date allowing for further amendment of the pleadings." SA50 (emphasis added). Even when the scheduling order was modified on October 30, 2015, "no party gave any indication of an intention to further amend the pleadings." SA50. Instead, it was understood "that the long history of pleading motion practice and decisions meant that the pleadings were closed." SA50.

The IPs ignore this history when they argue that "[t]he scheduling order did not specify a date after which no further pleading amendments could be made." IP Br. at 56. When the operative scheduling order was entered, this litigation already had been pending for over thirty months, and the parties already had engaged in two rounds of motion practice directed at the pleadings. *See* JA78; SA46. The District Court "made very clear that in ruling on the second round of pleading-stage motions that it sought to have final resolution of the pleadings and considered

-83-

the pleadings to be closed after rendering that round of decisions." SA55. The District Court thus properly rejected the argument that its scheduling orders left open the possibility of further amendments to the pleadings without good cause. *See* SA55. Rule 16(b) therefore governs the IPs' request for leave to amend.[34]

### 2. The District Court Did Not Abuse Its Discretion.

Under Rule 16(b), the party seeking to modify a scheduling order bears the burden of establishing good cause, *Parker*, 204 F.3d at 340, and the denial of such a request is reviewed for abuse of discretion, *Grochowski*, 318 F.3d at 86. As this Court has held, "a finding of 'good cause' depends on the diligence of the moving party." *Parker*, 204 F.3d at 340. "The district court . . . also may consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants." *Kassner* v. *2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 244 (2d Cir. 2007).

Here, the District Court found that "the record reflects—and the Court's understanding of the timing and progress of discovery in these actions confirms— that plaintiffs have for months had access to adequate documents and information to allow them to make their most significant proposed amendments." SA62. "Not

---

[34] Other courts have rejected the argument "that Rule 15 rather than Rule 16 applies" simply because a scheduling order does "not set a deadline for submitting an additional amended complaint." *In re Gen. Elec. Co. Sec. Litig.*, 2012 WL 2892376, at *4 (S.D.N.Y. July 12, 2012); *see also In re Wireless Tel. Servs. Antitrust Litig.*, 2004 WL 2244502, at *5 n.6 (S.D.N.Y. Oct. 6, 2004).

-84-

only had full discovery been actively proceeding for nearly a year by the time that plaintiffs filed [their] pending motion[], but plaintiffs also had access—prior to filing the operative complaints—to substantial productions of documents produced to regulators . . . ." SA62.

In arguing that there was no undue delay, the IPs focus entirely on when they learned the identity of JPMorgan's counterparty in the "Vlissingen swap," a swap of aluminum warrants between affiliates of JPMorgan and Glencore. IP Br. at 60-61.[35] According to the IPs, "[i]t was not until December 2015 that IPs received a discovery response identifying GIAG [Glencore International AG] as the legal entity that was JPMorgan's counterparty." *Id*. at 60. While noting that "a motion could have been brought in December or January," the IPs insist that they did not delay unduly in filing their motion in February 2016. *Id*. at 61.

The District Court correctly found, however, that the IPs had all of the information needed to identify the parties to the swap in question no later than *May 2015*—nine months before they sought leave to amend. SA63. After reviewing "the parties' arguments, the timing of production of the documents and

---

[35] JPMorgan entered into the so-called "Vlissingen swap" to obtain warrants for aluminum located close to the LME warehouses in Rotterdam owned by JPMorgan's warehouse affiliate. SJA203-07. After entering into the swap, JPMorgan cancelled the warrants and moved the aluminum into its affiliated warehouses in order to reduce its storage costs. SJA203-07.

materials upon which plaintiffs now rely," SA61, the District Court concluded that the IPs had "sufficient information to name as defendants" the parties to the swap by no later than May 2015. SA63. The record amply supports that finding. *See* SJA198-99; SJA202-14.

The IPs fare no better in challenging the District Court's finding that "allowing the amendments [would] seriously prejudice defendants." SA47. The IPs' assertion that this "ruling was driven by the impact of the FLPs' proposed amendment on class certification" is incorrect. IP Br. at 58. The District Court "also carefully reviewed the new allegations" in the IPs' proposed complaint and found "that—in contrast to the IPs' arguments to the contrary—the IPs have also fundamentally changed their claims." SA59 n.11. As a result, the court concluded, the IPs' amendments "would of necessity totally upend the existing schedule" and require that "[m]uch of the substantial work . . . performed to date . . . be redone." SA57.[36] The District Court expressly rejected the IPs' contention "that their amendments plead the same case that they have always alleged." SA57.

---

[36] The IPs' untimely addition of two new foreign defendants also would have made the existing schedule unworkable because service of those entities "would not be completed under the Hague Convention for at least several months" after fact discovery closed, which then would be followed by "vigorous motion practice." SA58.

As the court found, "a comparison of the [IPs'] JAC to [their] proposed amendments shows that these representations are far off the mark."  SA57.

Lastly, there are strong indications that the IPs did not proceed in good faith. After discovery had been proceeding for months, Fujifilm, represented by the same counsel that represents the other IPs, "filed its initial complaint, which contained allegations that were substantially similar to those asserted by the IPs in the JAC." SA51.  On "its last day to amend as of right" under Rule 15(a)(1)(B), however, Fujifilm filed an amended complaint asserting a "different, broader case."  SA47; SA51-52.  Shortly thereafter, the other IPs filed their motion for leave to amend, seeking to expand drastically both the parties and the scope of their case under the guise of "adopt[ing] the allegations contained" in Fujifilm's amended complaint. SA52.  The District Court thus questioned "whether Fujifilm's insertion into this litigation was intended to serve as a sort of Trojan Horse" for the other IPs' untimely amendments.  SA56 n.8.  The court ultimately concluded:

> Whether Fujifilm's late insertion into this action was a clever attempt by the other plaintiffs [to] take advantage of and piggyback on Fujifilm's opportunity to amend its pleading as of right with the benefit of all of the discovery taken to date is a question that this Court cannot answer.  At the very least, the Court believes that is a credible theory of plaintiffs' strategy.

SA65-66.  On this record, the District Court did not abuse its discretion in denying the IPs' motion to amend.[37]

### 3.    Even If Rule 15(a) Applies, There Was No Abuse of Discretion.

Even if Rule 15(a)'s more lenient standard applies, the District Court did not abuse its discretion.  Under Rule 15(a), a "district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *McCarthy* v. *Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  As discussed above, the IPs were far from diligent in seeking leave to amend—they filed their motion more than thirty months after the commencement of this litigation and only three months before the close of fact discovery—and the proposed amendment would have unduly prejudiced Defendants and required a lengthy extension of the fact discovery cutoff date.  SA46-53; SA57-60.  Denial of the IPs' motion was therefore also within the District Court's discretion under Rule 15(a).

## III.   The Dismissal of Reynolds and Southwire's Action Should Be Affirmed.

The District Court correctly concluded that Reynolds and Southwire allege the same anticompetitive conduct that was at issue in *Aluminum III*.  SA100-02.

---

[37] The IPs argue that the District Court was overly influenced by a desire to maintain its schedule.  IP Br. at 54.  To the contrary, the court was "mindful that [its] interest in preserving the current schedule" could not dictate its decision. SA60-61.

As the court explained, "[t]he Second Circuit's analysis focused on precisely the same conduct that forms the core of" both Reynolds and Southwire's original and proposed amended complaints. SA102. According to the court, the "fundamental mistake" that Reynolds and Southwire make—and "do not correct" in their amendments—"is to conflate experiencing some effect of anticompetitive conduct, on the one hand, with what constitutes antitrust injury as a matter of law, on the other." SA103. Because Reynolds and Southwire do not allege that they participated in the directly restrained warehouse market, the District Court properly held that *Aluminum III* forecloses their claim of antitrust injury.

## A. Reynolds and Southwire Cannot Allege Antitrust Injury Under *Aluminum III*.

A straightforward application of *Aluminum III* confirms that Reynolds and Southwire did not suffer antitrust injury. Reynolds and Southwire allege the same four types of anticompetitive conduct considered by this Court in *Aluminum III*: (i) "treat[ing] LME-imposed minimum daily load-out requirements as maximums," (ii) "offer[ing] incentive payments to primary aluminum owners to store primary aluminum in [their] warehouses," (iii) "strategically engag[ing] in . . . mass" warrant cancellations for "primary aluminum held in these warehouses," and (iv) "shuffl[ing] primary aluminum between their respective LME warehouses." R&S Br. at 14-15, 20. This Court concluded that "[a]ll of this conduct took place

(if at all) in the LME-warehouse storage market." *Aluminum III*, 833 F.3d at 162.[38] Because *Aluminum III* held that other aluminum purchasers did not suffer antitrust injury as a result of the same alleged conduct, the dismissal of Reynolds and Southwire's claims follows directly from that decision.

Each of the arguments that Reynolds and Southwire offer in an effort to avoid dismissal under *Aluminum III* fails as a matter of law.

1.    Reynolds and Southwire contend that they suffered antitrust injury because they "were forced to pay supracompetitive prices for the primary aluminum they purchased." R&S Br. at 49-50. But the Commercials and Consumers made the same argument—unsuccessfully. For example, the Commercials asserted that they suffered antitrust injury because they "paid higher prices as a result of the Defendants' alleged conspiracy." SJA667. The Consumers similarly contended that their "[p]ayment of supra-competitive prices as a result of anticompetitive conduct is plainly the type of injury the antitrust laws were intended to prevent." SJA618; *see also* SJA734. This Court nevertheless held that those plaintiffs did not suffer antitrust injury." *Aluminum III*, 833 F.3d at 161-63.

---

[38] Reynolds and Southwire also assert that "Defendants agreed to allocate specific regions between their respective warehousing operations"—conduct that also occurred (if at all) in the warehouse market. R&S Br. at 17-18.

2. Even though they claim the same injury—payment of an inflated price for aluminum—Reynolds and Southwire insist that their "claims are fundamentally different" from those in *Aluminum III*. R&S Br. at 28. But none of their attempted factual distinctions has merit.

- Reynolds and Southwire note that the Commercials and Consumers were "purchasers further down the distribution chain." *Id*. at 7. But the *Aluminum III* plaintiffs' position on the distribution chain was irrelevant to whether they suffered antitrust injury under this Court's decision—what mattered was that they, like Reynolds and Southwire, did not participate in the directly restrained warehouse market. *See supra* at 41-42. That is especially true because the Commercials and Consumers asserted their damages claims under state antitrust statutes that expressly authorize suits by indirect purchasers. *See id*.

- Reynolds and Southwire also assert that the plaintiffs in *Aluminum III* "did not directly pay the inflated Midwest Premium." R&S Br. at 35. That is incorrect: the Commercials explicitly alleged that they directly paid the Midwest Premium when they purchased semi-fabricated aluminum. SJA649; *see also* SJA647; JA354-57 (¶¶ 18-26); JA366 (¶ 48).

- Reynolds and Southwire next argue that the Commercials and Consumers "disavowed participation in any of the directly restrained markets." R&S Br. at 35. But Reynolds and Southwire likewise disavow participation in the only market that would have been directly restrained by the alleged conspiracy to lengthen warehouse queues—the warehouse market. Nor can Reynolds and Southwire establish antitrust injury under *Aluminum III* based on their participation with the trader Defendants in the aluminum market

because that is not "where the direct, immediate impact" of the alleged anticompetitive conduct "would have been felt." 833 F.3d at 162.

- Reynolds and Southwire stress that, unlike the Commercials and Consumers, they "purchased primary aluminum directly from" two trader Defendants. R&S Br. at 21. As the District Court correctly held, however, "that does not remedy the essential defect." SA95. Like the Commercials and Consumers, Reynolds and Southwire "premise[d] their claim to antitrust injury solely on their purchases of aluminum . . . on the physical aluminum market, where prices were allegedly *affected* by the defendants' anticompetitive behavior." *Aluminum III*, 833 F.3d at 162 (emphasis added). Under *Aluminum III*, such "effects" in a different market not directly restrained by Defendants' alleged anticompetitive conduct are insufficient to establish antitrust injury. *Id*.

3. In an attempt to escape *Aluminum III*, Reynolds and Southwire resort to a pleading sleight of hand. In their original complaint—filed two weeks before *Aluminum III* was decided—Reynolds and Southwire alleged a separate "market for LME-certified warehouse services for aluminum," JA3160 (¶ 64), where "the competition-reducing aspect of Defendants' conduct" supposedly occurred, JA3188 (¶ 158). After this Court decided *Aluminum III*, however, Reynolds and Southwire submitted a proposed amended complaint that deleted all explicit references to a separate warehouse market. *Compare* JA3225-27 (¶¶ 53-60) *with* JA3158-60 (¶¶ 56-65). On appeal, Reynolds and Southwire emphasize that their amended complaint pleads "only a 'primary aluminum market.'" R&S Br. at 43. Even assuming they can disavow their earlier allegations, the District Court

-92-

correctly held that the fact "that they no longer allege the existence of a separate warehouse services market, and instead [rely] on . . . 'a single primary aluminum market[,]' . . . does not resolve the issue." SA100 (citation omitted). "It nonetheless remains the case that, as before, all of the anticompetitive conduct at the heart of the proposed amendment occurs in . . . markets in which plaintiffs do not allege they participated." SA100.

4. Reynolds and Southwire argue that the District Court improperly applied a "purported 'locus' test" that looks to the market in which the anticompetitive conduct occurred. R&S Br. at 5. But the District Court's analysis closely followed this Court's approach in *Aluminum III*. After articulating its general rule, 833 F.3d at 161, this Court identified the alleged anticompetitive conduct and concluded that "[a]ll of [that conduct] took place (if at all) in the LME-warehouse storage market, and that is where the direct, immediate impact would have been felt." *Id*. at 162. The Court then stated: "Consumers and Commercials do not and cannot allege that they participated in that market." *Id*. The District Court properly followed each of those steps in holding that Reynolds and Southwire cannot plead antitrust injury based on the same alleged anticompetitive conduct.

5. Despite this Court's contrary ruling in *Aluminum III*, Reynolds and Southwire assert that Defendants directly restrained the aluminum market. R&S Br. at 5, 13-14. They argue that the trader Defendants "restrained the primary

-93-

aluminum market by incorporating [the] artificially inflated Midwest Premium into the price" they charged for aluminum. *Id*. at 15. But Reynolds and Southwire do not allege that Defendants *colluded* to insert the Midwest Premium into aluminum sales contracts; instead, they acknowledge that including the Midwest Premium in such contracts was consistent with industry practice. JA3181 (¶ 134); JA3253 (¶ 139). Reynolds and Southwire's allegation that Defendants engaged in *non-collusive* conduct in the aluminum market does not transform that market into the one directly restrained by the alleged anticompetitive conduct. Moreover, Reynolds and Southwire's argument improperly conflates the alleged anticompetitive conduct (already held to directly restrain only the warehouse market) with the supposed effect of that conduct (a higher Midwest Premium in the aluminum market). Under *Aluminum III*, the former is the focus in determining antitrust injury. *See* 833 F.3d at 161-62.

6. Reynolds and Southwire contend that the *Aluminum III* test applies only to "*McCready* plaintiffs." R&S Br. at 37-39. Of course, Reynolds and Southwire claimed to be *McCready* plaintiffs when they filed their action in July 2016, purporting to change their theory only after this Court decided *Aluminum III* two weeks later. *See* JA3145-46 (¶ 10). In any event, that is a distinction without a difference under *Aluminum III*, which articulates a general rule applicable to all antitrust plaintiffs. *See* 833 F.3d at 161; *supra* at 37-39, 71-72.

-94-

7. Reynolds and Southwire assert that Defendants "engaged in a horizontal price-fixing conspiracy in the primary aluminum market." R&S Br. at 44. But there is a fundamental difference between agreeing to "fix" a price and engaging in conduct in one market that supposedly *affects* prices in another market. *See supra* at 68-71.[39] Reynolds and Southwire allege only the latter. *See* JA3188-89 (¶ 158); JA3213 (¶ 8).

8. Reynolds and Southwire argue that "the purpose and intent of Defendants' conspiracy [was] to artificially increase the Midwest Premium." R&S Br. at 31. But the plaintiffs in *Aluminum III* likewise asserted that Defendants "intended to corrupt the market for primary aluminum." 833 F.3d at 162; *see also* SJA652; SJA734; SJA748-49. This Court nevertheless held that the "Consumers and Commercials . . . failed to allege (and could not allege) antitrust injury." *Aluminum III*, 833 F.3d at 163.

In short, it simply is not true that "Reynolds' and Southwire's claims are fundamentally different than those raised by the appellants in *Aluminum III*." R&S Br. at 28. For purposes of *Aluminum III*'s test for antitrust injury, their claims are indistinguishable.

---

[39] Reynolds and Southwire incorrectly rely on the section of *Knevelbaard Dairies* v. *Kraft Foods, Inc.*, 232 F.3d 979, 989-91 (9th Cir. 2000), that discusses the "directness" of plaintiffs' injury, which is relevant to the "efficient enforcer" requirement of antitrust standing, not to antitrust injury. *See* R&S Br. at 45.

## B.    Reynolds and Southwire's State-Law Claims Fail.

Reynolds and Southwire contend that the District Court erroneously dismissed their claims for violation of four state antitrust statutes and for unjust enrichment.  *Id*. at 62.  Those state-law claims are predicated on the same alleged conduct as Reynolds and Southwire's federal antitrust claim.  *See* JA3191-98 (¶¶ 169-211); JA3261-68 (¶¶ 161-209).  As this Court held in *Aluminum III*, failure to plead antitrust injury "is fatal to" both "federal and state antitrust-based claims." 833 F.3d at 163.  And, if "no antitrust claim survives, the parasitic unjust enrichment claim must be dismissed as well."  *In re Actos End Payor Antitrust Litig.*, 2015 WL 5610752, at *28 (S.D.N.Y. Sept. 22, 2015), *vacated in part on other grounds*, 848 F.3d 89 (2d Cir. 2017).

## C.    The District Court Properly Rejected Reynolds and Southwire's Proposed Amended Complaint.

Reynolds and Southwire argue that the District Court erred in dismissing their case "with prejudice without giving them an opportunity to amend their complaint."  R&S Br. at 58.  But the court considered their proposed amended complaint (SA100) and concluded that it did "not correct" the "fundamental mistake" in their initial complaint.  SA103.  The District Court thus correctly held that "it would be futile to allow" the amendment.  SA104.

Reynolds and Southwire contend that the District Court's "refusal to permit the amendment was error" because they "had an absolute right to amend" under

Rule 15(a)(1)(B). R&S Br. at 59. But the existence of a right to amend under Rule 15 does not immunize an amended complaint's allegations from scrutiny. A court need not accept an amended complaint if, as the District Court found here, its allegations could not survive a motion to dismiss. Reynolds and Southwire's contention that "[t]he futility standard is inapplicable [if] plaintiff has an absolute right to amend" (R&S Br. at 59-60) is therefore incorrect. *See Gosain* v. *State Bank of India*, 414 F. App'x 311, 315 (2d Cir. 2011) (holding that "amendment would be futile" despite "right to file an amended complaint as a matter of course").

## CONCLUSION

In *Aluminum III*, this Court articulated a general rule for establishing antitrust injury and applied that rule to the exact same allegations of anticompetitive conduct at issue here. Based on that controlling precedent, this Court should affirm the judgments dismissing Plaintiffs' actions for lack of antitrust injury.[40]

---

[40] This brief is limited to the issue of antitrust injury and thus does not address the many other deficiencies in Plaintiffs' claims. Defendants reserve the right to raise those other deficiencies in the District Court in any further proceedings.

Dated:  July 12, 2017

Respectfully submitted,

/s/ Richard C. Pepperman II

Richard C. Pepperman II
(*peppermanr@sullcrom.com*)
Suhana S. Han (*hans@sullcrom.com*)
William H. Wagener
(*wagenerw@sullcrom.com*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Defendants-Appellees The
Goldman Sachs Group, Inc., Goldman
Sachs & Co. LLC, Goldman Sachs
International, J. Aron & Company LLC,
MITSI Holdings LLC, Metro
International Trade Services L.L.C.*

/s/ Robert D. Wick

Robert D. Wick (*rwick@cov.com*)
Henry Liu (*hliu@cov.com*)
John S. Playforth (*jplayforth@cov.com*)
COVINGTON & BURLING LLP
One City Center
850 Tenth Street NW
Washington, D.C.  20001
Telephone:  (202) 662-6000
Facsimile:   (202) 662-6291

*Attorneys for Defendants-Appellees
Henry Bath LLC, Henry Bath & Son,
Ltd., JP Morgan Chase & Co.,
JPMorgan Chase Bank, N.A. and J.P.
Morgan Securities plc*

/s/ John M. Nannes

John M. Nannes
(*john.nannes@skadden.com*)
John H. Lyons
(*john.h.lyons@skadden.com*)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C.  20005
Telephone:  (202) 371-7500
Facsimile:  (202) 661-9191

*Attorneys for Defendant-Appellee
Pacorini Metals USA, LLC(now known
as Access World (USA) LLC)*

/s/ Eliot Lauer

Eliot Lauer (*elauer@curtis.com*)
Jacques Semmelman
(*jsemmelman@curtis.com*)
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, New York  10178-0061
Telephone: (212) 696-6000
Facsimile:  (212) 697-1559

*Attorneys for Defendant-Appellee
Glencore Ltd.*

-98-

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(C)

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure and this Court's Order of June 22, 2017, the undersigned counsel for Defendants-Appellees hereby certifies that this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font and contains 23,026 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

/s/ Richard C. Pepperman II
Richard C. Pepperman II

Dated: July 12, 2017

-99-

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2017, I caused the foregoing Joint Brief of Defendants-Appellees to be served via Electronic Mail generated by the Court's electronic filing system (CM/ECF) with a Notice of Docket Activity pursuant to Local Appellate Rule 25.1. All counsel of record are registered CM/ECF users.

Six hard copies of the foregoing Joint Brief of Defendants-Appellees were sent to the Clerk's Office by Hand Delivery to:

> Clerk of Court
> United States Court of Appeals, Second Circuit
> Thurgood Marshall United States Courthouse
> 40 Foley Square
> New York, New York 10007
> (212) 857-8576

/s/ Alessandra Kane
Alessandra Kane