

16-4230(L), 16-4305(CON),
16-4308(CON), 16-4233(CON), 16-4235(CON), 16-4243(CON)

# United States Court of Appeals

*for the*

# Second Circuit

EASTMAN KODAK COMPANY, AGFA CORPORATION, AGFA GRAPHICS
NV, FUJIFILM MANUFACTURING U.S.A., INC., MAG INSTRUMENT
INCORPORATED, CLARIDGE PRODUCTS AND EQUIPMENT,
INCORPORATED, individually and on behalf of all others similarly situated,
CUSTOM ALUMINUM PRODUCTS INCORPORATED, AMPAL
INCORPORATED, EXTRUDED ALUMINUM CORPORATION, REYNOLDS
CONSUMER PRODUCTS LLC, SOUTHWIRE COMPANY, LLC,

*Plaintiffs-Appellants,*

*(For Continuation of Caption See Inside Cover)*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS
## REYNOLDS CONSUMER PRODUCTS LLC
## AND SOUTHWIRE COMPANY, LLC

ROBERT J. PALMERSHEIM
DAVID E. KOROPP
ANAND C. MATHEW
MATTHEW G. MRKONIC
HONIGMAN MILLER SCHWARTZ AND COHN LLP
One South Wacker Drive, 28th Floor
Chicago, Illinois 60606
(312) 701-9300

*Attorneys for Plaintiffs-Appellants*
*Reynolds Consumer Products LLC*
*and Southwire Company, LLC*

– v. –

HENRY BATH LLC, METRO INTERNATIONAL TRADE SERVICES, L.L.C.,
JP MORGAN CHASE & CO., GOLDMAN SACHS & CO., GOLDMAN
SACHS INTERNATIONAL, JPMORGAN SECURITIES PLC, GLENCORE
LTD., PACORINI METALS USA, LLC, PACORINI METALS VLISSINGEN
B.V., JPMORGAN CHASE BANK, N.A., GLENCORE INTERNATIONAL AG,
GLENCORE AG, J. ARON & COMPANY, MITSI HOLDINGS LLC,
ACCESS WORLD (USA) LLC, HENRY BATH & SON LIMITED,

*Defendants-Appellees,*

GLENCORE XSTRATA PLC, GS POWER HOLDINGS LLC, MCEPF METRO
I, INCORPORATED, GOLDMAN SACHS GROUP, INC., PACORINI
METALS AG, LONDON METAL EXCHANGE LIMITED, LONDON METAL
EXCHANGE LIMITED, JOHN DOES 1-10, DOES 1-10, inclusive,
UNIDENTIFIED PARTIES, JOHN DOES 1-50,

*Defendants.*

# **TABLE OF CONTENTS**

Table Of Contents ..................................................................................i

Table Of Authorities ............................................................................ iii

Introduction ..........................................................................................1

I.    REYNOLDS AND SOUTHWIRE ADEQUATELY
ALLEGED ANTITRUST INJURY. ..................................................3

    A.    *Aluminum III* Does Not Bar Reynolds' And Southwire's
Claims. .................................................................................3

        1.    Reynolds' And Southwire's Injury Is Factually
Different Than The Injury Suffered By The
Commercials and Consumers In *Aluminum III*. ...............4

        2.    Reynolds' And Southwire's Injury Is Legally
Different Than The Injury Alleged By The
Commercials and Consumers In *Aluminum III*. ...............8

        3.    Accepting Defendants' Arguments Would Render
Nearly Every *McCready*-type Case Wrongly
Decided. .......................................................................11

    B.    Reynolds And Southwire Adequately Pled That
Defendants Restrained The Primary Aluminum Market. .........14

        1.    Any Conspiracy Formed For The Purpose Of
Manipulating Prices Is Illegal. ........................................15

        2.    Manipulating An Industry Benchmark Restrains
The Market Using That Benchmark. .................................18

        3.    The Court Should Disregard Defendants'
Argument That Reynolds And Southwire Were
Not Injured-In-Fact By Defendants' Conduct. ...............21

    C.    The District Court Erred By Rejecting Reynolds' And
Southwire's Well-Pled Market Allegations. .............................24

  D. There Is No Public Policy Justification For Immunizing Defendants' Anticompetitive Conduct. ....................................26

 II. THE DISTRICT COURT ERRED IN BARRING REYNOLDS AND SOUTHWIRE FROM AMENDING THEIR COMPLAINT.......................................................................................29

 III. THE DISTRICT COURT ERRED IN DISMISSING REYNOLDS' AND SOUTHWIRE'S STATE LAW CLAIMS. .......30

Conclusion ......................................................................................30

Certificate Of Compliance ......................................................................32

# TABLE OF AUTHORITIES

## Cases

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
  175 F. Supp. 3d 44 (S.D.N.Y. 2016) ........................................................ 2, 18, 19

*Blue Shield of Va. v. McCready*,
  457 U.S. 465 (1982) ............................................................................12

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ............................................................................29

*Catalano, Inc. v. Target Sales, Inc.*,
  446 U.S. 643 (1980) ............................................................................22

*Crimpers Promotions Inc. v. Home Box Office, Inc.*,
  724 F.2d 290 (2d Cir. 1983) .......................................................... 10, 13

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
  711 F.3d 68 (2d Cir. 2013) ....................................................................7

*Gelboim v. Bank of Am. Corp.*,
  135 S. Ct. 897 (2015) ..........................................................................24

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016) ....................................................... passim

*Gosain v. State Bank of India*,
  414 Fed. Appx. 311 (2d Cir. 2011) ....................................................29

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*,
  253 F. Supp. 2d 262 (D. Conn. 2003) ...........................................3, 19

*Ill. Brick Co. v. Illinois*,
  431 U.S. 720 (1977) ............................................................................26

*In re Aluminum Warehousing Antitrust Litig.*,
  833 F.3d 151 (2d Cir. 2016) ....................................................... passim

*In re Aluminum Warehousing Antitrust Litig.*,
  No. 14-3574 (L), 2015 WL 7076721 (2d Cir. Nov. 10, 2015)........................7, 28

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
   767 F. Supp. 2d 880 (N.D. Ill. 2011)...............................................................3, 19

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009) ...................................................................................26

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
   213 F. Supp. 3d 530 (S.D.N.Y. 2016)....................................................................18

*In re North Sea Brent Crude Oil Futures Litig.*,
   No. 13-md-2475, 2017 WL 2493135 (S.D.N.Y. June 8, 2017).........................20

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000) .............................................................. 2, 13, 19, 21

*New York v. Hendrickson Bros., Inc.*,
   840 F.2d 1065 (2d Cir. 1988) .................................................................................26

*Nw. Fruit Co. v. A. Levy & J. Zentner Co.*,
   665 F. Supp. 869 (E.D. Cal. 1986) ........................................................................22

*NYPL v. JPMorgan Chase & Co.*,
   No. 15 Civ 9300, 2017 WL 3309759 (S.D.N.Y. Aug. 3, 2017) .........................19

*Pullman v. Alpha Media Publ'g, Inc.*,
   624 Fed. Appx. 774 (2d Cir. 2015) ........................................................................23

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015) ................................................................... 2, 15, 16

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940). ............................................................................... 10, 17

*United States v. Vilar*,
   645 F.3d 543 (2d Cir. 2011) ...................................................................................24

## **Rules**

Fed. R. App. P. 28 ..........................................................................................................23

Fed. R. Civ. P. 15 ............................................................................................................29

## <u>Other Authorities</u>

Andrew Verstein, *Benchmark Manipulation*,
  56 B.C. L. Rev. 215 (2015) ...................................................................18

Black's Law Dictionary (10th ed. 2014) ..............................................6

Merriam-Webster Online (last visited August 9, 2017) ......................6

## INTRODUCTION

Defendants' brief focuses on the injury alleged by the Commercials and Consumers in *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151 (2d Cir. 2016) ("*Aluminum III*"), and ignores the injury that Reynolds and Southwire actually pled. In doing so, Defendants make a wrong turn at the outset and never recover.

Defendants argue that "[b]ecause Reynolds and Southwire do not allege that they participated in the directly restrained warehouse market, the District Court properly held that *Aluminum III* forecloses their claim of antitrust injury." Appellee Br. 89. This argument fails because Reynolds and Southwire do not have to allege that they participated in the "warehouse market." Reynolds and Southwire can allege that they suffered an antitrust injury in the directly restrained "primary aluminum" market. Unlike the Commercials and Consumers in *Aluminum III*, Reynolds and Southwire purchased primary aluminum directly from Defendants that colluded to increase the price of primary aluminum they sold.

As consumers in the restrained market that paid higher prices directly to Defendants, Reynolds and Southwire plainly suffer traditional antitrust injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Unlike the Commercials and Consumers (who were not participants in any market with Defendants), Reynolds and Southwire do

1

not have to rely on *McCready* or show that their injury was "inextricably intertwined" with injury in some other market to obtain antitrust standing.

Nothing in *Aluminum III* bars Reynolds and Southwire from alleging that Defendants restrained the primary aluminum market. To the contrary, *Aluminum III* recognized that defendants could increase the price of primary aluminum (and thereby restrain that market) by manipulating primary aluminum in warehouses they controlled. In that scenario, consumers in the primary aluminum market such as Reynolds and Southwire that paid Defendants inflated prices would suffer antitrust injury.

Defendants' brief fails to reconcile the District Court's decision with any of the *McCready*-type cases in which there are two potential sets of plaintiffs in different markets that are injured by defendants' anticompetitive conduct. In every one of these cases, the traditional plaintiffs such as Reynolds and Southwire suffered antitrust injury notwithstanding that the machinery behind defendants' scheme was "located" in a different market. Nor can Defendants distinguish the price-fixing cases such as *United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015) and *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016), or the benchmark manipulation cases such as *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44 (S.D.N.Y. 2016); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767

F. Supp. 2d 880 (N.D. Ill. 2011); and *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262 (D. Conn. 2003).

The upshot of all these cases is that manipulation of an industry price benchmark such as the Midwest Premium is a direct restraint of the market that uses that benchmark. To hold otherwise, would open the floodgates to benchmark manipulation and make it incredibly easy for banks and other actors to "make prices" in markets that use derived benchmark pricing. Here, Defendants acted collusively through multiple actions, including constraining supply, to manipulate the benchmark price for primary aluminum they sold to consumers. It is immaterial how or where they manipulated the benchmark because Defendants took advantage of their manipulation in the primary aluminum market where they operated.

Because the District Court erred as a matter of law in dismissing Reynolds' and Southwire's claims, this Court should reverse the decision below.

## I. REYNOLDS AND SOUTHWIRE ADEQUATELY ALLEGED ANTITRUST INJURY.

### A. *Aluminum III* Does Not Bar Reynolds' And Southwire's Claims.

Defendants premise the majority of their argument on the assumption that the injury Reynolds and Southwire suffered is the same injury that the

Commercials and Consumers suffered in *Aluminum III*. Because that assumption is both factually and legally incorrect, Defendants' arguments fail.

> **1. Reynolds' And Southwire's Injury Is Factually Different Than The Injury Suffered By The Commercials and Consumers In *Aluminum III*.**

Defendants argue that Reynolds and Southwire suffered the same injury as the Commercials and Consumers because they alleged the "same four types of anticompetitive conduct" considered in *Aluminum III*. Appellee Br. 28. To be sure, Reynolds and Southwire alleged *some* of the same anticompetitive conduct as that alleged by the Commercials and Consumers in *Aluminum III*. They alleged that Defendants conspired to acquire warehouses certified by the LME to transact in primary aluminum, purchased and stockpiled enormous volumes of primary aluminum in certain of these LME warehouses, and colluded to restrict the removal of primary aluminum from them. *See, e.g.,* JA3161-3163 ¶¶ 66-73; JA3178-3180 ¶ 126-129; JA3228-3231 ¶¶ 61, 63-70; JA3249-3250 ¶¶ 129-32. This was the machinery by which Defendants carried out their anticompetitive scheme.

However, Reynolds and Southwire diverge from the Commercials and Consumers in a key respect relevant here: alleging antitrust injury. Unlike the Commercials and Consumers, Reynolds and Southwire alleged that Defendants sold primary aluminum to them at illegally inflated prices. JA3144 ¶ 4; JA3181-3182 ¶¶ 134-35; JA3211-3213 ¶¶ 2, 7, 9. Unlike the Commercials and Consumers,

4

Reynolds and Southwire were consumers in the primary aluminum market that Defendants restrained by charging an illegal price and were the immediate and direct victims of Defendants' anticompetitive conduct. JA3153 ¶¶ 41-42; JA3181 ¶ 134; JA3189 ¶¶ 159-160; JA3225 ¶ 52; JA3253-3254 ¶ 138-40; JA3259 ¶ 158.

Attempting to sweep Reynolds and Southwire in with the Commercials and Consumers, Defendants resort to their own sleight of hand. They assert that the Commercials and Consumers also premised their claim to antitrust injury solely on their purchases of aluminum "on the *physical* aluminum market" and also alleged that they "paid higher prices" as a result of Defendants' conspiracy. Appellee Br. 90-92 (emphasis added.) However, the Commercials and Consumers did not purchase *primary aluminum* and therefore were not participants in the *primary aluminum* market. Nor did the Commercials and Consumers pay "higher prices" in the *primary aluminum* market or do so as Defendants' consumers.

Rather, the Commercials and Consumers purchased "semi-fabricated and fabricated aluminum" and alleged that they paid inflated costs that other purchasers passed down to them downstream. *Aluminum III*, 833 F.3d at 155-156. The defendants in *Aluminum III* did not sell semi-fabricated or fabricated aluminum, or store semi-fabricated or fabricated aluminum in their warehouses. The Commercials' and Consumers' harm could reasonably be termed "collateral damage" because the prices they paid for semi-fabricated and fabricated aluminum

5

products were affected by an increase in price charged by other non-conspirators further upstream for a different product.[1]  *Id*. at 163.

Defendants' assertion that the Commercials' and Consumers' position on the distribution chain was irrelevant to whether they suffered antitrust injury engages in the wrong analysis.  What mattered was not the fact that they could still bring indirect purchaser claims under state antitrust statutes, but the fact that they did not directly suffer harm at the hands of the Defendants in the Defendants' market. *Aluminum III*, 833 F.3d at 162 ("[T]he injury Consumers and Commercials claim was suffered down the distribution chain of a separate market, and was a purely incidental byproduct of the alleged scheme.").  The Commercials and Consumers could not allege antitrust injury because the supply constraint imposed by Defendants' warehouses did not involve semi-fabricated or fabricated aluminum, but rather primary aluminum.

In *Aluminum III*, the Commercials and Consumers were forced to "disavow participation in any of the markets in which the defendants operate" because there were no allegations that Defendants ever (i) participated in the semi-fabricated or fabricated aluminum market, (ii) sold semi-fabricated or fabricated aluminum to

---

[1] *See, e.g.,* Collateral Damage, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/collateral%20damage (last visited August 9, 2017) ("Injury inflicted on something other than an intended target."); Collateral, BLACK'S LAW DICTIONARY (10th ed. 2014) ("Accompanying, but secondary and subordinate to.").

any of the Commercials or Consumers, or (iii) charged any of the Commercials or Consumers supracompetitive prices. *Aluminum III*, 833 F.3d at 161. Indeed, Defendants argued in *Aluminum III* that the Commercials and Consumers lack standing because they "do not contend that they paid any overcharge originally imposed by a Defendant" and "do not allege that they purchased aluminum through a chain of distribution that included any conspirator." *In re Aluminum Warehousing Antitrust Litig.*, No. 14-3574 (L), 2015 WL 7076721, at *45, 49 (2d Cir. Nov. 10, 2015). Thus, while the Commercials and Consumers may have paid "higher prices" down the line, they did not participate in any market in which Defendants operated and never directly paid Defendants supracompetitive prices. *See Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 78 (2d Cir. 2013) ("Directness in the antitrust context means close in the chain of causation.") (quotation omitted.)

Not so for Reynolds and Southwire. There is no dispute that Reynolds and Southwire participate in the same market as Defendants because Defendants sold primary aluminum to Reynolds and Southwire and charged them a supracompetitive price. Reynolds' and Southwire's injury was not "collateral damage" nor were they merely "affected" by Defendants' anticompetitive behavior down the distribution chain. There is no victim in the primary aluminum market that is more direct and no other market in which this injury was suffered.

7

### 2. Reynolds' And Southwire's Injury Is Legally Different Than The Injury Alleged By The Commercials and Consumers In *Aluminum III*.

The *McCready* theory of injury asserted by the Commercials and Consumers is different than the traditional antitrust injury asserted by Reynolds and Southwire. Because the Commercials and Consumers did not operate in the same market as Defendants, they attempted to assert standing under *McCready* alleging their injury was "inextricably intertwined" with injuries suffered in either the warehouse market or the primary aluminum market (neither of which they participated in). By contrast, Reynolds and Southwire alleged traditional antitrust injury as consumers in the same market as Defendants. *Gelboim*, 823 F.3d at 772 ("[W]hen consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'") (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

Defendants assert that in *Aluminum III*, the Court held that "all of [Defendants'] alleged conduct (if it in fact occurred) would have directly restrained the warehouse market, not the aluminum market." Appellee Br. 41. At best, this is an overstatement of *Aluminum III* based on the Court's interpretation of a different pleading by different parties. *Aluminum III* held that the conduct the Commercials and Consumers alleged "took place" in the LME-warehouse storage market and

8

that a "direct, immediate impact" would have been felt there.  *Aluminum III*, 833 F.3d at 162.

However, the fact that some of Defendants' conduct may have involved LME warehouses does not forbid Reynolds and Southwire from alleging that Defendants' anticompetitive conduct restrained the primary aluminum market and had a "direct, immediate impact" on consumers in that market that were forced to pay supracompetitive prices.  Indeed, Defendants' own communications reveal that the goal of the conspiracy was to cause a direct, immediate impact on prices in the primary aluminum market.

As Metro's President explained, "[P]hysical traders in conjunction with banks and producers hold [primary aluminum] stock and withhold metal sales to consumers in order to squeeze up the premiums."  JA3168 ¶ 90; JA3237 ¶ 93. "[T]he metal we get is withheld from consumers and makes the premium go up." JA3165 ¶ 79; JA3233 ¶ 75.  JPMorgan's head of commodities admitted, "We need to be active in the underlying physical commodity markets in order to understand and make prices."  JA3161-3162 ¶ 69; JA3229 ¶ 66.  Likewise, the LME recognized that "the fundamental role of the queues is to increase premiums." JA3169 ¶ 97; JA3239 ¶ 100.  And the Senate Report aptly noted that the bank's use of their physical warehouse operations "had the effect or potential effect of

manipulating or influencing commodity prices."  JA3176 ¶ 117; JA3245-3246 ¶ 120.

How Defendants accomplished their anticompetitive scheme is immaterial. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940).  Certainly, Defendants' conduct also impacted warehouse consumers through increased rent and longer load out times.  But Goldman Sachs, JPMorgan, and Glencore did not enter the primary aluminum market simply to become aluminum landlords collecting rent.  They entered the aluminum market to, in their words, "make prices."  JA3161-3162 ¶ 69; JA3229 ¶ 66.

There is no inherent conceptual problem with anticompetitive conduct directly impacting multiple groups of victims.  For example, in *Crimpers Promotions Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 291 (2d Cir. 1983), the Court found that both the cable television programmers and the trade show organizer suffered a "direct" harm resulting from Defendants' anticompetitive conduct.  This is especially the case where, as here, the respective injuries are distinct and not duplicative.  *Id*. at 293-94 ("Crimpers' injury from having its trade show destroyed…is distinct and different from the losses of producers in getting too little for their programs or of cable television stations in paying too much.").

In fact, *Aluminum III*, itself, recognized that Defendants' conduct could directly impact consumers in the primary aluminum market.  "If the trader and

10

warehouse operator defendants sought to increase the price for primary aluminum, and they could not do so directly, one alternative means at their disposal would be manipulating the LME-warehouse storage market…In such a scenario, injuring the participants in the LME-warehouse storage market by forcing them to pay higher storage costs might be deemed the 'essential means' by which the defendants achieve their purported objective." *Aluminum III*, 833 F.3d at 163. Defendants do not dispute that primary aluminum consumers would have traditional antitrust standing under that scenario as the participants in the market directly restrained by Defendants' anticompetitive scheme—regardless of whether the "essential means" took place somewhere else. That the Commercials and Consumers remained "collateral damage" because they did not participate in the primary aluminum market is immaterial here because Reynolds and Southwire *do* participate in that market.

### 3. Accepting Defendants' Arguments Would Render Nearly Every *McCready*-type Case Wrongly Decided.

Defendants do not dispute that in a *McCready*-type case, there will nearly always be at least two groups of potential plaintiffs with antitrust standing: (1) the traditional antitrust plaintiffs that are the objective of defendants' anticompetitive scheme; and (2) the "*McCready* plaintiffs" that are the "fulcrum" defendants use to carry out the scheme. Yet, accepting Defendants' argument would mean that nearly every one of these *McCready*-type cases would be wrongly decided. *See*

11

Reynolds & Southwire Br. 38-40) (citing *Blue Shield of Va. v. McCready*, 457 U.S. 465, 479-81 (1982); *Crimpers*, 724 F.2d at 294-95; *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 174 (3d Cir. 2015); *Am. Ad. Mgmt. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999).)

Defendants cannot reconcile their arguments with these cases. Defendants assert that in *McCready*, "there was no suggestion that the psychiatrists stood to profit from injuring the single boycotted bank, except insofar as that conduct restrained the psychotherapy market" and that, by contrast, here, Defendants "profited from that restraint through higher warehouse rents." Appellee Br. 77. That argument lacks merit for three reasons.

First, the traditional antitrust plaintiffs in *McCready* were the psychologists, not the hypothetical bank. *Blue Shield of Va. v. McCready*, 457 U.S. 465, 478-79 (1982) (noting defendants' argument that psychologists could maintain suit). Even in the bank hypothetical, the Supreme Court acknowledged that both the bank *and* the psychologists could file suit (the bank as the *McCready* plaintiff and the psychologists as the traditional plaintiffs). *McCready*, 457 U.S. at 484 n. 21 ("[P]lainly, in evaluating the reasonableness under the antitrust laws of the psychiatrists' conduct, we would be concerned with its effects not only on the

12

business of banking, but also on the business of the psychologists against whom that secondary boycott was directed.").[2]

Second, Defendants do not explain why their anticompetitive conduct should be immunized simply because they were able to extract two types of illegal profits directly from *both* the *McCready* plaintiffs (rent from the warehouse consumers) *and* the traditional plaintiffs (inflated premiums from the primary aluminum consumers). Defendants cite no authority or policy rationale supporting such a perverse theory and none exists. The warehouse consumers and the primary aluminum consumers suffered distinct injuries resulting from Defendants' anticompetitive conduct. Accepting this argument would mean that antitrust violaters could distinctly injure consumers in multiple markets in which they participate, and yet limit their liability to a single one. That is not and should not be the law. *See infra* p. 18. Indeed, in *Knevelbaard*, the Ninth Circuit rejected the same argument where the plaintiff's complaint alleged that defendants participated in both the cheese market (where defendants manipulated the price) and the milk market (where the plaintiffs and defendants transacted with each other and defendants took advantage of their conduct). 232 F.3d at 989.

---

[2] Defendants' attempt to distinguish *Crimpers* fails for the same reason. In *Crimpers*, the trade-show operator had standing as a *McCready* plaintiff, defendants conceded that the producers and stations would have standing as traditional antitrust plaintiffs, and the Court noted that "defendants here may have to pay Crimpers as well as the producers and the stations if they were to file suit and ultimately prevail." 724 F.2d at 294.

Third, Defendants' argument reveals exactly why the District Court's "locus" test cannot be correct. Defendants argue that in the *McCready* bank hypothetical, the psychiatrists did not profit from injuring the boycotted bank, "except insofar as *that conduct restrained the psychotherapy market*." Appellee Br. 77 (emphasis added.) In other words, the psychiatrists' anticompetitive conduct in the banking market (*i.e.*, the boycott of the bank) *restrained* the psychotherapy market. Thus, under Defendants' own reasoning, anticompetitive conduct that occurred in one market (the bank market) restrained another market (the psychotherapy market). The psychologists would suffer an antitrust injury notwithstanding that the machinery of the anticompetitive scheme occurred elsewhere.

**B. Reynolds And Southwire Adequately Pled That Defendants Restrained The Primary Aluminum Market.**

Defendants argue that they did not restrain the primary aluminum market because "there is a fundamental difference between agreeing to 'fix' a price and engaging in conduct in one market that supposedly *affects* prices in another market." Appellee Br. 95 (emphasis in original.) To the contrary, any conspiracy formed for the purpose of manipulating prices is illegal and constitutes a restraint in that market because consumers must pay prices that no longer reflect ordinary market conditions.

14

### 1. Any Conspiracy Formed For The Purpose Of Manipulating Prices Is Illegal.

Defendants admit that, under *Gelboim*, "consumers that purchase a price-fixed product directly from a price-fixer suffer antitrust injury." Appellee Br. 62 (citing *Gelboim*, 823 F.3d at 772-75). This is because a market where prices are artificially fixed is a restrained market that no longer reflects ordinary market conditions. *See Gelboim*, 823 F.3d at 774 ("[T]he anticompetitive effect of the Banks' alleged conspiracy would be that consumers got less for their money."). Indeed, Defendants conceded before the District Court that "if you had sellers of aluminum get together and make a horizontal agreement to fix the price of the aluminum they were selling, then purchasers of aluminum would have antitrust injury because *the anticompetitive conduct would be directly in the primary aluminum market*." JA2963 (emphasis added.)

Without citing a single case in support, Defendants argue that their scheme was not price fixing because they merely engaged in conduct that *affected* the price. Appellee Br. 68-71, 95. Defendants' argument fails because it is undisputed that a price fixing conspiracy is "not limited to agreements that literally set or restrict prices." *Apple, Inc.*, 791 F.3d at 327. "Instead, any conspiracy 'formed *for the purpose and with the effect* of raising, depressing, fixing, pegging, or stabilizing the price of a commodity…is illegal per se.' and the precise 'machinery employed…is immaterial.'" *Id*. (citing *Socony-Vaccum*, 310 U.S. at 223)

15

(emphasis added.)  Thus, engaging in collusive conduct to affect a price constitutes price fixing—regardless of whether a specific dollar figure has been agreed to by the conspirators.

Defendants' attempt to distinguish *Apple* on the basis that it involved concerted action in the same market in which prices were artificially raised is inapposite.[3]  In fact, the Court held that while Apple did not directly raise book prices, the contractual terms it imposed as part of its conspiracy with book publishers "had the *effect* of raising prices because it created an incentive for the Publisher Defendants to demand that Amazon adopt an agency model and to seize control over consumer-facing ebook prices industry-wide."  791 F.3d at 316 (emphasis in original.)  Moreover, as here, *Apple* involved a combination of vertical and horizontal agreements.  The fact that Apple had entered into vertical agreements with book publishers to orchestrate its horizontal conspiracy did not immunize its conduct.  *Id*. at 323.

Defendants' attempt to distinguish *Gelboim* fares no better.  *Gelboim* did not limit antitrust injury to competitors that collude to make false submissions in order to "fix" a price.  To the contrary, *Gelboim* held that "[e]ven though the members of

---

[3] Defendants' argument is also factually wrong.  In *Apple*, the Court noted that because Apple's e-book price caps were tied to the price of hardcover books, publishers increased the prices of their newly released hardcover books to shift the e-book versions into a higher price category.  791 F.3d at 310.  Thus, as here, the anticompetitive conduct did not take place solely in the "trade e-books market." *Id*. (noting relevant market allegations).

the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces." 823 F.3d at 773 (quoting *Socony-Vacuum*, 310 U.S. at 221.) Notably, *Gelboim* disregarded as immaterial defendants' argument that LIBOR was not itself a "price" as it was "not itself bought or sold by anyone"— holding that "LIBOR forms a component of the return from various LIBOR-denominated financial instruments, and the fixing of a component of price violates the antitrust laws." 823 F.3d at 771. Because consumers paid prices that no longer reflected ordinary market conditions, they suffered antitrust injury. *Id*. at 772.

Defendants' attempt to distinguish *Socony-Vacuum* also fails. *Socony-Vaccum* held it was immaterial that "the prices paid by the combination were not fixed in the sense that they were uniform and inflexible." 310 U.S. at 223. Moreover, contrary to Defendants' argument that the anticompetitive conduct occurred in the "same market," the conduct in *Socony-Vacuum* involved a collusive agreement to buy "distressed" gasoline to prevent it from depressing the overall spot gasoline market. *Id*. at 224 ("Where the means for price-fixing are…as here, purchases of a part of the supply of the commodity for the purpose of keeping it from having a depressive effect on the markets, such power may be found to exist though the combination does not control a substantial part of the commodity."). The supply restraint in *Socony-Vacuum* is nearly on all fours with

17

Defendants' scheme here to control part of the supply of primary aluminum to increase prices in the entire primary aluminum market.

> **2.    Manipulating An Industry Benchmark Restrains The Market Using That Benchmark.**

As these sophisticated Defendants are well aware, benchmarks that summarize market prices "have become essential to contemporary markets." Andrew Verstein, *Benchmark Manipulation*, 56 B.C. L. REV. 215 (2015). "They are written directly into industrial contracts, financial derivatives, statutes, and regulations, and so their accuracy affects the economy every bit as much as the prices themselves." *Id*.; *see, e.g., Gelboim*, 823 F.3d at 765 (noting that LIBOR is called "the world's most important number" because it is used in countless business dealings); *Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 49 (noting that ISDAfix is incorporated into a broad range of financial derivatives); *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 543 (S.D.N.Y. 2016) (noting that the Fix Price is used to price, benchmark and/or settle billions of dollars in physical silver and silver financial instruments every day).

 "Tampering with a benchmark is far easier and can have an equivalent impact to actually moving the real price of the asset."  Verstein, *Benchmark Manipulation*, at 225.  For that reason, courts have repeatedly held that there is antitrust injury when defendants collude to rig a benchmark used as a component of price—regardless of how or where that benchmark is derived.  *See NYPL v.*

*JPMorgan Chase & Co.*, No. 15 Civ 9300, 2017 WL 3309759, at *4 (S.D.N.Y. Aug. 3, 2017) ("Following *Gelboim*, the district courts have similarly found antitrust injury in other cases alleging manipulation of financial or commodities benchmarks.") (citing cases); *Knevelbaard Dairies*, 232 F.3d 979; *Alaska Elec. Pension Fund*, 175 F. Supp. 3d 44; *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880; *Ice Cream Liquidation, Inc.*, 253 F. Supp. 2d 262.

In describing *Ice Cream Liquidation* before the District Court, Defendants conceded that when you have "a forced link between the prices in two markets," then "when you restrain CME butter price, by definition, you have restrained the milk price because by government regulation the CME butter price is…a component of the minimum milk price." JA2973-2974. That the Midwest Premium is a component of the primary aluminum price by industry standard rather than government regulation is a distinction without a difference. Reynolds and Southwire alleged that long-term primary aluminum contracts incorporated the Midwest Premium, that it was impossible to procure primary aluminum without paying the Midwest Premium, and that Defendants, themselves, sold primary aluminum at prices incorporating the Midwest Premium. JA3144 ¶¶ 4-5; JA3157-58 ¶¶ 54-55; JA3181 ¶ 134; JA3212 ¶¶ 5-6; JA3224 ¶¶ 50-51; JA3228 ¶¶ 61-62; JA3253-54 ¶ 139.

As a recent Southern District of New York case recently observed, "[c]ourts in this Circuit consider manipulation of a price benchmark to constitute restraint of the market which that benchmark guides." *In re North Sea Brent Crude Oil Futures Litig.*, No. 13-md-2475, 2017 WL 2493135, at *10 (S.D.N.Y. June 8, 2017) (citing cases). "This is true regardless whether the alleged anticompetitive conduct causing the benchmark manipulation took place in the market guided by it so long as defendants also operate in that market." *Id.*; *see also Gelboim*, 823 F.3d at 776 ("[E]ven if none of the appellants' financial instruments paid interest *at* LIBOR, *Socony-Vacuum* allows an antitrust claim based on the influence that a conspiracy exerts on the starting point for prices.") (emphasis in original.)

Defendants do not even attempt to distinguish these benchmark manipulation cases other than to claim that *Knevelbaard* did not discuss antitrust injury. Appellee Br. 95 n. 39. To the contrary, in noting that "[a]ntitrust injury requires that the 'injured party be a participant in the same market as the alleged malefactors,'" the Ninth Circuit held:

> The defendants here contend that they are in one market (cheese) while the plaintiffs are in another (fluid milk). But the complaint's allegations unmistakably place all parties in the milk market—the defendants as buyers and the plaintiffs as sellers—and even have them transacting business with each other. For present purposes those allegations must be accepted as true.

20

232 F.3d at 989 (quoting *Am. Ad Mgmt. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999)).

The same is true here. Defendants—sellers in the primary aluminum market—acted collusively to manipulate the benchmark price for primary aluminum they sold to consumers in the primary aluminum market. It is immaterial that Defendants manipulated the benchmark price by restraining supply using LME warehouses because Defendants took advantage of their manipulation in the primary aluminum market where they charged higher prices.

Following the District Court's lead would open the floodgates to widespread benchmark manipulation. Instead of manipulating a commodity price directly, banks and other market actors could simply manipulate the benchmark. Given that manipulating the commodity price directly would be prohibited by the antitrust laws, it makes no sense to allow these market actors to limit antitrust liability simply by using another (and often, far easier) means. As numerous cases in the commodities markets, futures markets, and derivative markets demonstrate, that is not and should not be the law.

### 3. The Court Should Disregard Defendants' Argument That Reynolds And Southwire Were Not Injured-In-Fact By Defendants' Conduct.

Defendants devote substantial time arguing to this Court that the supply restraint they created did not increase the Midwest Premium, or that the increase in

21

the Midwest Premium had no effect because it purportedly did not increase the "all-in" price. *See, e.g.,* Appellee Br. 13, 16-17. This simply disregards Reynolds' and Southwire's allegations and denies that Reynolds and Southwire suffered an injury-in-fact. The Court should disregard these arguments for three reasons.

First, this Court has to *assume* the existence of an antitrust violation in determining antitrust standing. *Gelboim*, 823 F.3d at 770. This Court must—as the District Court did—accept at the pleading stage "that plaintiffs here paid higher prices as a result of the alleged conduct." SA103.

Second, any question regarding whether Reynolds and Southwire were injured-in-fact, or to what extent, is a question of fact that cannot be resolved at the pleading stage. *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648-49 (1980) (holding agreement to eliminate credit sales extinguishes one component of competition between sellers even if it could ultimately lead to corresponding decreases in the overall price); *Nw. Fruit Co. v. A. Levy & J. Zentner Co.*, 665 F. Supp. 869, 872 (E.D. Cal. 1986) (court cannot assume at summary judgment stage that increase in one price component "would be offset by a corresponding decline in other price components" because that "remains a triable issue of fact"). Nearly all of Defendants' arguments regarding the reasons for and purported effect of their conduct, the linkage between the warehouse activity and the Midwest Premium, and the relationship between the Midwest Premium and the "all in" price simply

22

represent, at best, disputed factual issues that the District Court could not resolve on the pleadings. [4]

Third, Defendants' arguments rely completely on material outside the narrow record in Reynolds' and Southwire's appeal. In fact, Defendants' "Statement of Facts" ***does not cite a single allegation*** from either Reynolds' and Southwire's Complaint or FAC.[5] Appellee Br. 4-10. *See* Fed. R. App. P. 28(a)(6) & (b) (statement of the case must set out the facts relevant to the issues submitted for review "with appropriate references to the record"); *Pullman v. Alpha Media Publ'g, Inc.*, 624 Fed. Appx. 774, 779-80 (2d Cir. 2015) (appellate court's review is limited to record on appeal).

---

[4] For example, Defendants ask this Court to make factual findings on: (1) whether their conspiracy to artificially inflate the Midwest Premium actually resulted in an increase to the "all-in price"; (2) whether sham aluminum sales and shuttling of aluminum from one LME warehouse to another were simply a cost-saving mechanism; and (3) whether queues formed because of a glut of aluminum caused by the "Great Recession." All of these purported "facts" are disputed in Reynolds' and Southwire's Complaint and FAC.

[5] Although Defendants largely cite the "record" indiscriminately when making arguments against Reynolds and Southwire, only 257 out of 4,801 "Appendix" pages are part of the record on appeal for Reynolds and Southwire. JA214-220, JA2947-3020, JA3139-3276, SA112-147, Supp. App. 79-80. Unlike the other appellants, Reynolds did not take, receive, or gain access to any discovery in the court below. None of the depositions, documents, expert reports, and other materials cited by Defendants or the other appellants are part of the record on appeal for Reynolds and Southwire. In fact, Reynolds and Southwire only saw most of the "sealed" materials part of the Sealed Joint Appendix for the first time in April 2017 when the other appellants circulated them for purposes of this consolidated appeal.

The "record" for Reynolds and Southwire essentially consists of the Complaint that Reynolds and Southwire filed and the FAC that Reynolds and Southwire attempted to file, but the District Court rejected. *See Gelboim v. Bank of Am. Corp.*, 135 S. Ct. 897, 904 (2015) ("Cases consolidated for MDL pretrial proceedings ordinarily retain their separate identities."); *United States v. Vilar*, 645 F.3d 543, 548 (2d Cir. 2011) (noting that although appeals could be consolidated they would entail "different standards, different records, and separate analyses").[6]

Unlike the other appellants, Reynolds and Southwire were still at the pleading stage when the District Court *sua sponte* dismissed their case. Appellees had not answered Reynolds' and Southwire's Complaint (or even moved to dismiss it). Even if Appellees had moved to dismiss, they would have been limited to the factual allegations in Reynolds' and Southwire's pleadings. The Court should disregard Defendants' reliance on materials outside of Reynolds' and Southwire's pleadings because at the pleading stage, Reynold's and Southwire's well-pled allegations must be taken as true.

### C. The District Court Erred By Rejecting Reynolds' And Southwire's Well-Pled Market Allegations.

The District Court erred as a matter of law by making a factual finding at the pleading stage that Defendants' anticompetitive conduct occurred in the

---

[6] In fact, although Reynolds and Southwire's case was designated as "related" to the MDL, it was never joined to the MDL.

"warehouse services" or "warrant trading" markets—markets which Reynolds and Southwire did not even allege in their FAC. By disregarding Reynolds' and Southwire's well-pled market allegations, the District Court engaged in improper fact finding at the pleading stage. Defendants do not, and cannot, dispute any of the cases Reynolds and Southwire cited holding that "market definition is a deeply fact-intensive inquiry" and that the proper market definition can be determined "only after a factual inquiry" into the commercial realities faced by consumers. Reynolds & Southwire Br. 53-54.

In response to the FLPs, Defendants argue that a single primary aluminum market "defies economic sense" because "consumers cannot substitute physical aluminum" for warehouse services.[7] Appellee Br. 49. Not only does that simply raise a factual dispute, it misconstrues Reynolds' and Southwire's market allegations. Buyers like Reynolds and Southwire can use aluminum stored in LME warehouses or outside of LME warehouses for their needs because the aluminum functions in the same manner for the same purposes. JA3159 ¶ 61; JA3226-3227 ¶ 55, 58. Thus, primary aluminum stored in LME warehouses is interchangeable with primary aluminum stored outside of LME warehouses. The purpose of Defendants' anticompetitive scheme was to strategically restrain primary aluminum stored in LME warehouses to "make prices" in the entire primary

---

[7] Defendants do not appear to assert this argument against Reynolds and Southwire. However, to avoid any doubt, Reynolds and Southwire address it here.

25

aluminum market.  JA3161-3162 ¶ 69; JA3229 ¶ 66.  The fact that they did so by making it difficult and expensive to remove the primary aluminum from LME warehouses was merely the mechanism by which they manipulated the benchmark price.

### D.   There Is No Public Policy Justification For Immunizing Defendants' Anticompetitive Conduct.

The Supreme Court has recognized a "longstanding policy of encouraging vigorous private enforcement of the antitrust laws."  *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 745 (1977).  Reynolds and Southwire are the parties that purchased primary aluminum directly from Defendants at supracompetitive prices.  They are the parties that Defendants deliberately targeted and exploited with their collusive scheme to increase the price that consumers like them paid to Defendants.  They are not parties in some other market that were merely affected by Defendants' collusive conduct somewhere else.  Defendants do not and cannot cite a single case barring a plaintiff's injury where a defendant has manipulated a price, caused it to rise illegally, and then charged it to a plaintiff.  A purchaser that must pay a defendant supracompetitive prices as a result of defendants' anticompetitive conduct "plainly" suffers an injury of the type the antitrust laws were intended to prevent.  *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009); *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1079 (2d Cir. 1988); *Gelboim*, 823 F.3d at 772.

26

Moreover, the damages that Reynolds and Southwire seek for paying supracompetitive prices to Defendants are not duplicative of whatever injury users of LME warehouses may have suffered as a result of long queues and increased warehouse rents. Allowing only LME warehouse users to pursue damages would deny a remedy to consumers that directly suffered a non-duplicative harm as a result of Defendants' collusive anticompetitive conduct.

Indeed, Defendants likely face *no* liability for their anticompetitive conduct given that the LME warehouse users are largely corrupted by Defendants' collusive scheme and unlikely to pursue antitrust claims. The LME warehouse users are mostly (i) Defendants that colluded to store and shuttle aluminum in and between each other's warehouses, and (ii) producers that Defendants induced with large incentive payments to store aluminum in warehouses. JA3166 ¶¶ 81, 83; JA3168-3169 ¶¶ 92-96; JA3173 ¶ 108; JA3175-3177 ¶¶ 114-120; JA3234-3235 ¶¶ 83, 86; JA3238-3239 ¶¶ 95-99; JA3242-4243 ¶¶ 111; JA3245-3247 ¶¶ 117-123. Both groups were, themselves, responsible for creating, maintaining, and lengthening the warehouse queues. The suggestion that these users are the only parties with standing to bring antitrust claims is fanciful at best.

Notwithstanding Defendants' purported concerns with overdeterrence, ruinous costs, the burden on the judicial system, and chilling economically efficient competitive behavior (Appellee Br. 36), Defendants do not identify how

27

any of those risks could apply to the claims Reynolds and Southwire brought. Nor could they, because in challenging the claims brought by the Commercials and Consumers, Defendants argued to this Court that there is a "fundamental distinction between (i) antitrust plaintiffs that purchase directly or indirectly from an antitrust conspirator and (ii) those that purchase in a chain of distribution that includes no conspirators." *In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 7076721, at *45-46. Defendants declared that the latter category (*i.e.*, the claims of the Commercials and Consumers) presented "prohibitive risks of overdeterrence, disproportionate liability and undue complexity." *Id.* at *49. However, Defendants conceded that "[m]uch of this complexity—and the related risks of overdeterrence and disproportionate liability—***falls away*** if antitrust standing is limited to plaintiffs that purchase directly or indirectly from an antitrust offender." *Id.* at *51-52 (emphasis added.)

Now faced with the claims of plaintiffs that purchased directly from them, Defendants are unable to articulate any policy justification for excluding Reynolds' and Southwire's claims. Unlike cases in which courts have found that a plaintiff's injury does not constitute an "antitrust injury," Defendants cannot point to any way in which their collusive conduct *benefited* competition in the primary aluminum market or explain why awarding damages for the type of injury Reynolds and Southwire suffered would be inimical to the purposes of antitrust law. *Cf*

28

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487 (1977) (antitrust laws were not enacted to protect competitors from "profits they would have realized had competition been reduced").

## II. THE DISTRICT COURT ERRED IN BARRING REYNOLDS AND SOUTHWIRE FROM AMENDING THEIR COMPLAINT.

Defendants do not dispute that Rule 15(a)(1)(B) gave Reynolds and Southwire an absolute right to amend. Yet, citing *Gosain v. State Bank of India*, 414 Fed. Appx. 311 (2d Cir. 2011), Defendants argue that the District Court could properly bar Reynolds and Southwire from filing an amended complaint based on futility. To the contrary, in *Gosain*, the Court found that "it was ***error*** for the district court to reject the amended complaint when Gosain still had the right to file an amended pleading as a matter of course without leave of the court pursuant to Rule 15(a)." *Id*. (emphasis added). The Court found the district court's error in *Gosain* harmless because the original complaint was dismissed for lack of subject matter jurisdiction pursuant to the Foreign Sovereign Immunities Act and thus could not be cured by amendment. *Id*. By contrast, here, the District Court dismissed Reynolds' and Southwire's complaint *sua sponte* based on pleading deficiencies that the District Court conceded could be cured by amendment. *See* SA128 (acknowledging that while a direct standing theory might be "possible to develop, it is not the theory on which this case has been litigated").

29

While Defendants characterize Reynolds' and Southwire's FAC as a "pleading sleight of hand," they do not identify anything improper about the pleading itself. They do not identify anything that prevented Reynolds and Southwire from amending their allegations, adding, removing, or changing allegations, or asserting a new legal theory. Since Defendants neither moved against nor answered Reynolds' and Southwire's original Complaint, none of their arguments against the other appellants that it was too late to amend or change theories apply to Reynolds and Southwire. *See, e.g.,* Appellee Br. 48, 52, 54-55, 64-67, 81-89.

## III. THE DISTRICT COURT ERRED IN DISMISSING REYNOLDS' AND SOUTHWIRE'S STATE LAW CLAIMS.

Defendants do not dispute that they never moved to dismiss Reynolds' and Southwire's state law claims and the District Court never addressed them. Accordingly, the District Court's *sua sponte* dismissal of those claims was error.

## <u>CONCLUSION</u>

For the reasons discussed above, Reynolds and Southwire respectfully request that this Court reverse the decision below and remand the case to the District Court for further proceedings.

Dated: August 15, 2017                    Respectfully submitted,

                                          /s/ Robert J. Palmersheim
                                          Robert J. Palmersheim
                                          (*RPalmersheim@honigman.com*)
                                          David E. Koropp
                                          (*DKoropp@honigman.com*)
                                          Anand C. Mathew
                                          (*AMathew@honigman.com*)
                                          Matthew G. Mrkonic
                                          (*MMrkonic@honigman.com*)
                                          HONIGMAN MILLER SCHWARTZ
                                          AND COHN LLP
                                          One South Wacker Drive, 28th Floor
                                          Chicago, Illinois 60606
                                          Phone: (312) 701-9300
                                          Facsimile: (312) 701-9335

                                          *Attorneys for Plaintiffs-Appellants*
                                          *Reynolds Consumer Products LLC and*
                                          *Southwire Company, LLC*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of 2nd Cir. R.

32.1(a)(4)(B) because this brief contains 6,840 words, excluding the parts of the

brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

2010 in 14 pt. Times New Roman font.

Dated: August 15, 2017

/s/ Robert J. Palmersheim
Robert J. Palmersheim
HONIGMAN MILLER SCHWARTZ
AND COHN LLP
One South Wacker Drive, 28th Floor
Chicago, Illinois 60606
(312) 701-9300

*Attorneys for Plaintiffs-Appellants*
*Reynolds Consumer Products LLC*
*and Southwire Company, LLC*